XENIA P. MAKLETZOVA *vs.* SERGEL DIAGHILEFF.

Suffolk.   March 13, 1917. — May 25, 1917.

Present: RUGG, C. J., DE COURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Contract,* What constitutes, Performance and breach, Construction.  *Damages,* Liquidated.

In an action against the manager of a ballet company for the breach of a contract in writing to employ the plaintiff as the principal dancer in certain ballets, the defence relied upon was that the defendant properly refused to allow the plaintiff to appear because the plaintiff refused to dance in the ballet of "The Enchanted Princess," and the plaintiff admitted such refusal but contended that she was justified in refusing because that ballet was not one of those mentioned in the contract. The defendant then produced a copy of the contract on which below the signatures was written an unsigned provision that "The Enchanted Princess" was to be substituted for one of the ballets named and testified that the substitution was made by mutual agreement at the request of the plaintiff. This the plaintiff denied. *Held,* that, whether the clause of substitution had been adopted by the parties as a part of the contract, was a question of fact for the jury.

In the same case it was *held* that, whether the plaintiff was justified as a reasonable person in refusing to dance with a certain man dancer as her partner because she had reason to fear that physical harm would come to her through his in-

experience or want of proficiency, was a question of fact for the jury, and that, whether the plaintiff's refusal to dance with certain partners was merely capricious and arbitrary, also was a question of fact dependent on the weight that the jury should give to her words of refusal in view of the occasion of their utterance and the possible provocation for hasty and inconsiderate speech.

In the case above described the jury returned a verdict for the plaintiff in the sum of $4,500, and by a stipulation of the parties the question was submitted to this court, whether a certain sum named in the contract was fixed by the parties as liquidated damages for a breach of the contract. The provision was as follows: "In case of a breach of this agreement the offending party shall pay to the offended party as damages in the sum of eighteen thousand five hundred (18,500) rubles, and in addition thereto, in case any one of the parties shall commit a breach of any of the first four points of this agreement, the other party has the right to consider herself released from the further performance of this contract." The sum named was in excess of the total sum to be paid for services rendered and expenses incurred. The term "liquidated damages" was used accurately in an immediately preceding provision of the contract in connection with the discharge of the obligation of the plaintiff to the Moscow Theatres. *Held,* that the provision of the contract must be construed merely as fixing a penalty for a breach of the contract and not as fixing the amount of liquidated damages.

CONTRACT, for the alleged breach of a contract in writing in the Russian language, a translation of which was attached to the record and is printed below, dated and executed in Russia on September 18, 1915. Writ dated February 4, 1916.

In the Superior Court the case was tried before *Chase,* J. The translation of the contract was as follows:

"Petrograd. One thousand nine hundred and fifteen. September eighteenth. We, the undersigned, the nobleman, Sergei Pavlovitch Diaghileff, of the first part, and the artist of the Imperial Moskow Theatres, Xenia Petrovna Makletzova, of the second part, have concluded between them the present contract as follows:

"1. Diaghileff invites Makletzova and Makletzova accepts the invitation to take part as premiere danser in performances to be arranged by Diaghileff from the eighteenth day of January (new style) nineteen hundred and sixteen to the first day of May (new style) nineteen hundred and sixteen in North America. Besides as aforesaid Makletzova is obliged to go to the City of Luzane or to some other city to be chosen by said Diaghileff on the first day of November (old style) nineteen hundred and fifteen for rehearsals of ballets and to take part in two charity performances to be given by Diaghileff.

"2. In the performances to be arranged by Diaghileff, Makletzova shall perform the most important rôles in the ballets: — "L'Oiseau de Feu" (The Bird of Fire); "Pavillon d'Armide" (Armide's House); "Les Sylphides" (The Nymphs); "Carnival;" "Petrouchka;" and "Dafins and Kloia."

"3. From the date of the conclusion of this agreement and to its termination, and in case this agreement is extended then to the period of its extension, Makletzova obliges herself that she will not dance nor do anything in her profession, publically [*sic*] or for private persons, or for moving picture films, whether for compensation or without compensation, and shall not place herself under the direction of any person except without [*sic*] the express written permission of Diaghileff.

"4. For the performance of the work mentioned in paragraph one of this agreement, Diaghileff is to pay to Makletzova the sum of seventeen thousand (17,000) rubles, to be paid to her every two weeks, beginning with the first performance in North America, in equal payments. In addition, the said Diaghileff obliges himself to pay to Makletzova from the day she is leaving Petrograd up to the first performance in North America, two thousand (2000) francs per month, to be paid her every two weeks one thousand (1000) francs each, and to pay her railroad fares and steamship ticket, first-class, wherever she may go for the purpose of performing during the above mentioned season, and a return ticket from that city where the season will end to Moskow, and also steamship passage from Europe to America and return for her mother.

"5. The sickness of Makletzova is here acknowledged and in that case she shall not be obliged to perform under this contract, the said Diaghileff to retain two hundred (200) rubles for each performance that she may not attend.

"6. Diaghileff obliges himself to pay to the Directorate of the Imperial Moskow Theatres liquidated damages due from Miss Makletzova in the sum of two thousand (2000) rubles if said Directorate of the Theatres demands the same. The said Diaghileff further obliges himself to give said Makletzova an advance of three weeks before she leaves Petrograd in the sum of three thousand (3000) rubles.

"7. In case of a breach of this agreement the offending party

shall pay to the offended party as damages in the sum of eighteen thousand five hundred (18,500) rubles, and in addition thereto, in case any one of the parties shall commit a breach of any of the first four points of this agreement, the other party has the right to consider herself released from the further performance of this contract.

"8. Makletzova shall appear at an evening performance in not more than two ballets. Matinee performances shall take place only once a week and Makletzova shall appear in only one ballet. Diaghileff has the right to arrange performances daily except Sundays.

"9. Diaghileff has the right to extend this contract to the first day of September (new style) nineteen hundred and sixteen if mutually satisfactory.

"10. In case Miss Makletzova does not appear at one of the matinees, said Diaghileff has the right to retain one hundred (100) rubles for each performance.

Sergei Pavlovitch Diaghileff."

The evidence is described in the opinion. At the close of the evidence the defendant asked the judge to give to the jury the three instructions which are quoted in the opinion. The judge refused to give any of these instructions and also refused to give other instructions requested by the defendant, the exceptions to the refusal of which were waived. The judge submitted the case to the jury, who returned a verdict for the plaintiff in the sum of $4,500 "and in answer to questions propounded to them by the court found that the plaintiff had not broken the contract but that the defendant had."

The defendant alleged exceptions, which contained the statement quoted in the preceding sentence and also contained the following stipulation: "It is further stipulated between the parties that, if the defendant's exceptions are overruled, the Supreme Judicial Court shall then decide whether paragraph 7 of the contract . . . is to be construed as one fixing a certain sum as liquidated damages. Upon this point, too, the plaintiff introduced evidence by one Mrs. Aline Delano, an expert in the translation of Russian documents, who testified that the Russian word translated in Paragraph 7 as damages did not mean penalty nor

indemnity but damages for breach of a contract. If the Supreme Judicial Court shall decide that said paragraph 7 fixes the sum therein named as liquidated damages, judgment for the plaintiff is to be ordered in the sum of $6,012.50 with interest; otherwise, judgment for the plaintiff upon the verdict."

*H. A. Murphy,* (*C. N. Barney & R. T. Woodruff* with him,) for the defendant.

*E. C. Stone,* (*J. Michelman* with him,) for the plaintiff.

Pierce, J. At the close of the evidence the defendant asked the judge to instruct the jury as follows:

2. "Upon all the evidence there was a material breach of the contract by the plaintiff on or about February 1, 1916, and the defendant was thereby relieved from further obligation to perform the contract."

3. "Upon all the evidence there was a material breach of the contract justifying the refusal of the defendant to continue, after February 2, 1916, to allow the plaintiff to dance at performances arranged by him."

5. "Upon all the evidence the plaintiff repudiated the contract on or about February 1, 1916, and relieved the defendant from further obligation to perform."

These requests were refused and the defendant excepted.

On September 18, 1915, at Petrograd in Russia, the plaintiff and the defendant entered into a written contract whereby the plaintiff bound herself to perform the most important rôles in certain ballets, and in compensation therefor the defendant agreed to pay the plaintiff at certain times during the continuance of the contract stipulated sums for services and expenses. There was evidence that both parties proceeded to act on the contract, from the date of the contract (both in Russia and subsequently upon coming to the United States) until February 2, 1916, up to which time no breach of contract was claimed by either party. The troupe consisted of several first dancers, or solo dancers, and also of a large *corps de ballet.* Its first performance was given in Boston on January 31, 1916.

The defendant, under the assertion that the conduct of the plaintiff on the evening of January 31, 1916, and on the evening of February 1, 1916, was such that he was entitled to treat the contract as materially broken, on February 2, 1916, wrote a letter

to the plaintiff in which he notified her that because of her refusal
to carry out the terms of her contract he had been obliged to
engage another to take her place, and that directions had been
given to refuse her admission to the Opera House. There is not
any dispute but that on the second of February the defendant
did bar the plaintiff from the Opera House in which the company
was then performing, and that he prevented her at that time, and
has ever since, from performing in any way any of the performances
which are called for in the contract or any subsequent contract.

. The refusal of the plaintiff to dance in "The Enchanted
Princess" upon the opening night at the Opera House, on the
ground that it did not stand in the contract, led to a conference
between the plaintiff and defendant on the evening of February 1,
1916, at which various other persons were present. At this meet-
ing the defendant contended and the plaintiff denied that the
contract had been modified by an oral agreement to substitute
several dances, among them "The Enchanted Princess," for an
equal number of dances named in the contract. The defendant
said to the plaintiff that Barocchi had told him that she refused
to dance in "The Enchanted Princess." The plaintiff replied that
she was not obliged to take part in the performances not named
in the contract. The defendant then asked why she had done it
before. She replied she had done so "from amiability, from a
sense of trying to please." The defendant then asked why Baroc-
chi had told him that the plaintiff would dance it for $150. The
plaintiff's answer was that from this *pas de deux* (which was a
dance when a lady and gentleman dance together) her feet suffered,
and she was only willing to dance it on opening nights. The de-
fendant then read from the contract the names of the ballets that
the plaintiff had agreed to dance in; then read certain language
in his copy of the contract which had been written below the
signatures but which was unsigned by either party, the purport
of which was that the parties were to substitute "'The Enchanted
Princess' . . . ." The plaintiff after this had been read said
that, since she had not signed the substitute clause written below,
she was not obliged to perform the dances. She further stated
"I did not agree verbally, but there was a conversation about it."
The defendant then said that she had said that she wished to
substitute "The Enchanted Princess" for "Carnival." The

plaintiff replied that she wanted to do this, but, since the "unpleasant consequences that happened to her feet, she warned him that she would not dance them [it]." The foregoing excerpts from the testimony show that the evidence required the submission of the issue of a substituted contract or not to the jury.

The second ground upon which the defendant contends that the plaintiff violated the contract in a material and substantial respect is that the plaintiff refused to dance and rehearse with a certain male dancer as her partner, named Gavriloff. The plaintiff testified "that in the dances which she had agreed to dance by her written agreement she danced with a male partner, that in the various dances it was necessary for her to be supported by a male partner, and that unless that male partner was strong or skillful enough there might be physical injury to herself. She further testified that Gavriloff, the partner furnished to her in 'The Enchanted Princess,' with whom she was to dance, was merely of the *corps de ballet*, that she had not rehearsed with him, and that it was not reasonably safe for her to dance it with him. She testified further that several rehearsals were necessary with this supporting male dancer in order that the dance might be accomplished with safety to herself, and that she refused to rehearse with Gavriloff. The plaintiff furthermore in her testimony gave a description of the various dances and of the various physical acts required of the male partner, including the act of supporting and carrying her, and, as she leaped into the air from a position on her toes, of catching her again in the descent, and of a variety of other physical acts calling for rehearsal in order that it might be done without injury to herself and calling for unusual skill to prevent injury to herself; and testified further that the dancer Gavriloff, with whom she refused to dance, was not an experienced dancer and could not do the various physical acts with safety to her, although she admitted that he danced this with other partners and with Lopokova."

In cross-examination she testified "that she told the defendant she would not dance the 'Sylphides' with any other partner but Bolm but would dance it with Bolm; that she told the defendant she did not recognize him as her director; that she told the defendant that she would not perform in the dances in her contract unless with a partner satisfactory to herself; that in answer to

a question, 'And you told him, did you not, that you would not even dance with the great Nijinski unless you felt like it?' she said, — 'No, I said not if I didn't choose to but without a rehearsal I will not dance;' that Diaghileff said to her, 'Now, here is our contract; I am ready to perform its terms; are you?' to which she replied that she wished to do all that was stated in it; that she also said to him that she only refused to dance with certain men, that she would dance if he would change the male partners; that the defendant then ordered her to dance, as her director, to which she replied that her director was Kovinski, director of the Imperial Theatres, and she only recognized him.     The plaintiff further testified, on cross-examination, that when she called the defendant an 'entre-preneur' the defendant left; that the word 'entre-preneur' means the one who invites or engages the artist, and that it might also mean one who undertakes some theatrical enterprise."

While the plaintiff had no right to select her own partners and was bound to follow the directions of the defendant, nevertheless the plaintiff was not bound to subject herself to conditions which were not the usual and ordinary risks incidental to the performance of her dances, and her refusal so to do would not be a breach of her contract.     Whether she was justified as a reasonable person in refusing to dance with Gavriloff or with any other dancer, because she had reason to fear that physical harm would come to her through the inexperience or want of proficiency of partners, manifestly was a question of fact for the determination of the jury. Whether upon the evidence the plaintiff refused to dance with experienced partners, or to perform in the dances in her contract unless with a partner satisfactory to herself, through whim, caprice or arbitrary and childlike insistence, was also a question of fact, dependent on the weight the jury should give to her words in view of the occasion of their utterance and the possible provocation for hasty, inconsiderate, unmeant and hollow speech.

The actual damage sustained by the plaintiff was found by the jury to be $4,500.     It is stipulated that "if the defendant's exceptions are overruled, the Supreme Judicial Court shall then decide whether paragraph 7 of the contract . . . is to be construed as one fixing a certain sum as liquidated damages."     Paragraph 7 reads, "In case of a breach of this agreement the offending party shall pay to the offended party as damages in the sum of eighteen

thousand five hundred (18,500) rubles, and in addition thereto, in case any one of the parties shall commit a breach of any of the first four points of this agreement, the other party has the right to consider herself released from the further performance of this contract."

The contract contains no agreement that the damages named in paragraph 7 shall be treated as liquidated damages. The sum stipulated is greatly in excess of the actual damages found to have been sustained. It is also in excess of the total sum to be paid for services rendered and expenses incurred. The use of the words "liquidated damages" in the preceding paragraph of the contract wherein the defendant undertakes to discharge the obligation of the plaintiff to the Moscow Theatres, is at least evidence that the parties to the contract advisedly used the words "liquidated damages" to accurately express their intention in dealing with a defined and absolute obligation. The omission of the word "liquidated" in paragraph 7, considered in connection with its use in paragraph 6, leads to the inference of an intent merely to fix a penalty in case any one of the parties shall commit a breach of any of the first four points of the agreement. *Fish* v. *Gray,* 11 Allen, 132. *Guerin* v. *Stacy,* 175 Mass. 595, 597.

The damages which must have resulted from a breach of the defendant's contract could not have exceeded the aggregate of the several sums named in the contract. They were in no sense uncertain in their nature and they were susceptible of exact proof by reference to ordinary pecuniary legal standards. *Hall* v. *Crowley,* 5 Allen, 304, 305.

It follows that we are of opinion that paragraph 7 is not to be construed as fixing a certain sum as liquidated damages.

*Exceptions overruled.*

*Judgment for the plaintiff on the verdict.*