### In re BERRY ESTATES, INC., Debtor.

### Bankruptcy No. 83 B 20284.

United States Bankruptcy Court,
S.D. New York.

Nov. 16, 1983.

determining the amount of mortgage indebtedness owing from the debtor, Berry Estates, Inc. to Jamaica, including the amount of allowable post-maturity interest. Jamaica urges the application of a post-maturity rate of interest at 2 percent over the floating prime rate of Bankers Trust Company, or over the prime rate of any other major New York money market bank, from the time of the maturity of the mortgage until payment. The debtor maintains that the post-maturity rate should be the mortgage's pre-maturity rate of 8¼ percent or at a rate no higher than the 9 percent prejudgment rate permitted on contract claims under Section 5001(a)[1] of the New York Civil Practice Law and Rules ("CPLR").

## FACTS

1. The debtor filed with this court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 1, 1983 and was continued in business as a debtor in possession in accordance with 11 U.S.C. § 1108. The debtor is the owner and operator of a twelve building garden apartment complex in Spring Valley, Rockland County, New York.

2. Jamaica holds a first mortgage lien upon ten of the twelve buildings, the land upon which the ten buildings are located and the rents and profits from the property. The debtor's schedules list Jamaica's mortgage claim at $2,672,091, plus accrued interest from December 17, 1981, the maturity date.

3. Jamaica took by assignment a number of mortgage notes, bonds and mortgages encumbering the debtor's property and made an additional mortgage loan of approximately $50,000 on December 17, 1971. Jamaica and the debtor also entered into an extension agreement on December 17, 1971. This agreement restated the amount of all

Zalkin, Rodin & Goodman, New York City, for Jamaica Savings Bank FSB.

Skadden, Arps, Slate, Meagher & Flom, New York City, for debtor.

DECISION ON ORDER TO SHOW CAUSE FOR AN ORDER DETERMINING AMOUNT OF MORTGAGE INDEBTEDNESS OWING FROM THE DEBTOR

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Jamaica Savings Bank FSB ("Jamaica") seeks an order pursuant to 11 U.S.C. § 502

---

1. § 5001(a) does not "permit" a 9 percent interest rate. It allows prejudgment interest, but is silent as to a rate. However, § 5004 states "[i]nterest shall be at the rate of nine per cen-

tum per annum, except where otherwise provided by statute." N.Y.Civ.Prac.Law § 5004 (McKinney 1964 & Supp.1982–1983).

the mortgages taken by assignment and Jamaica's additional loan, all totalling approximately $3,300,000, with interest at 8¼ percent per annum, with a maturity date of December 17, 1981. The mortgage, as extended, called for constant monthly payments of $26,125 on the first day of each month until maturity on December 17, 1981, when the principal balance, together with interest was to be paid.

4. On December 3, 1981, a representative of Jamaica met with the debtor's principal and his two sons to discuss an extension of the mortgage. Jamaica's representative informed them that the debtor could have a three-month extension during which time the debtor could arrange to obtain funds to satisfy the mortgage. The three-month extension would carry an interest rate of 2 percent above prime with a floor of 17 percent and a ceiling of 19½ percent. A letter agreement covering the terms for the proposed extension was sent to the debtor, but it was not executed.

5. The debtor failed to pay the principal balance and interest on the maturity of the mortgage on December 17, 1981. This failure occurred notwithstanding Jamaica's letter dated December 14, 1981 informing the debtor of the due date and inquiring whether the debtor intended to seek an extension of the mortgage.

6. By letter dated January 27, 1982, Jamaica wrote to the debtor to the effect that the offer of an extension agreement had expired and that Jamaica demanded full payment of the past due mortgage plus accrued interest. The debtor was also informed that unless the mortgage was satisfied by February 5, 1982, Jamaica would commence a mortgage foreclosure action and move for the appointment of a receiver.

7. The unpaid principal balance of the mortgage indebtedness now totals over $2,662,328.99, exclusive of accrued interest. The parties part ways as to the rate of the post-maturity interest.

8. Section 29 of the extension agreement dated December 17, 1981 provided in pertinent part that in the event of a de-

fault, interest would be payable from the date of default

at the maximum legal rate of interest *then permitted* for mortgage loans or the interest rate as set forth in the obligation or this extension agreement, *whichever is higher.* (emphasis added)

9. On December 17, 1971, when the extension agreement was made, the maximum legal rate of interest for mortgages of this type was 7½ percent pursuant to New York Banking Board Regulation 4.1, 3 C.R.R. § 4.1 (1983). The interest rate set forth in the extension agreement was 8¼ percent. Jamaica was entitled to charge an interest rate that was ¾ percent higher than the allowable 7½ percent maximum rate permitted by Bankruptcy Board Regulation 4.1 because § 5–521 of the New York General Obligations Law expressly excluded corporations (the debtor is a corporation) from interposing the defense of usury. *See McNellis v. Merchants National Bank and Trust Company,* 390 F.2d 239, 241 (2d Cir. 1968). Moreover, effective June 7, 1974, § 5–501 of the New York General Obligations Law was amended so as to remove the interest ceiling on all real estate loans, other than for one or two family residences, in excess of $250,000, subject however, to a criminal usury penalty for loans carrying an interest rate in excess of 25 per cent.

10. In 1980, however, § 5–501 of the New York General Obligations Law was again amended by adding a subsection 6(b) which removed any maximum rate of interest for any loans in the amount of $2,500,-000 or more. This amendment also eliminated the 25 percent criminal usury penalty.

11. Since the execution of the extension agreement on December 17, 1971, mortgage interest rates in New York have substantially increased, as have the charges for money that lending institutions pay to finance their mortgage operations.

## DISCUSSION

This is not a case where the parties failed to specify a post-maturity interest rate on a matured mortgage loan. On December 17, 1971, the parties agreed that the interest

rate after maturity would be the higher figure between the 8¼ percent required under the mortgage and the maximum amount allowable on corporate mortgages in New York, which was then the 25 percent criminal usury ceiling. When the parties entered into the extension agreement, they did so knowing that a 25 percent post-maturity rate might be charged. They did not know that the ceiling on interest rates would later be lifted in New York for mortgages in excess of $2,500,000 and that the sky would be the limit, subject to the doctrine of unconscionability.

When the parties discussed a three-month mortgage extension on December 3, 1981, Jamaica informed the debtor that an additional three-month extension would carry an interest rate of 2 percent above prime. The debtor did not sign the proposed extension agreement but also, did not pay the mortgage indebtedness when it matured. State court foreclosure proceedings were brought to a halt when the debtor filed its Chapter 11 petition and obtained the benefit of the automatic stay of all litigation against the debtor, as provided by Code § 362(a).

The debtor is sufficiently sophisticated to know that 8¼ percent interest rates on real estate mortgages, as called for during the pre-maturity period under the mortgage in question, or 9 percent rates which apply to judgments in New York, are not realistically obtainable anywhere. Nevertheless, the debtor would have this court impose either of these low rates as the applicable post-maturity interest rate. Indeed, the debtor seeks to be rewarded for its default. Had the law in New York not been amended in 1980, the debtor would now be required to pay the highest rate then allowable in New York, which was 25 percent. The removal of the 25 percent maximum rate of interest on mortgages in excess of $2,500,000 was not intended as a benefit for mortgagors. It was a reflection of the fact that the legislature desired to make New York, as a financial center, competitive with other financial centers and in recognition of the fact that "[t]he prime lending rate to the most creditworthy corporate borrowers ... reached 19%, and ... many corporate borrowers pay a primium [sic] over prime...." Governor's Program Memorandum, N.Y.S. Res. 8811, 1980 N.Y.S.Leg.Ann. 162.[2]

Although the debtor argues that a higher post-maturity interest rate is a penalty, it

2. *Usury, Interest Rates*

*General Obligations Law:* § 5–501. The purpose of this bill is to amend the General Obligations Law and Penal Law to conform the provisions of such laws to changed economic conditions. The New York Legislature, in 1965, upon findings by the State Commission of Investigation that organized crime was conducting a vast usurious money-lending business in this state, amended the Penal Law to provide that the charging of interest at a rate exceeding 25% per annum would constitute "criminal usury", a felony. This legislation was intended to provide a weapon against the criminal loan shark where no effective one had existed, and was not intended to affect the conduct of legitimate money lending businesses. It is noteworthy that at the time the Penal Law was amended in 1965 the "prime rate" was 4½% and had never exceeded 5% during the post-World War II period. Unprecedented credit conditions in this country, resulting in part from actions taken by the Federal Government, have changed the premise on which the 25% criminal usury limit was enacted. *The prime lending rate to the most creditworthy corporate borrowers has not reached 19%* and rates could reach even

higher levels in the immediate future. Since *many corporate borrowers pay a primium [sic] over prime,* a large number of corporate loans presently bear interest at levels approaching 25% per annum. Interest rates are now at a point where borrowers in New York may be cut off from credit in the near future, with an adverse effect not only on such borrowers but also on their employees and the economy of the State. The standing of New York as a financial center has produced jobs, income and tax revenue. In the past, the legislature has recognized the need for state action to be taken for the preservation and expansion of the financial industry in New York. Because of the present usury ceiling, competing financial centers where similar limits do not exist are taking advantage of the uncertainty which the ceiling produces and are attracting financial business which otherwise would go to New York. Jobs will be lost to New York. This legislative action is required to stop this trend and to insure that New York remains a center for finance and financial employment. Governor's Program Memorandum, N.Y.S.Res. 8811, 1980 N.Y.S.Leg.Ann. 162 (emphasis added).

could have avoided paying a higher rate by satisfying the mortgage at maturity. The higher rate merely reflects the fact that a mortgagor who is unable to pay a mortgage at maturity is a greater risk then a mortgagor not in default. Hence, a less creditworthy entity must pay a premium to obtain the continued use of money. Additionally, a higher post-maturity rate of interest is intended as an inducement for the mortgagor to pay at maturity and not delay the mortgagee beyond the agreed maturity of the loan.

■ Even if the parties did not expressly agree to a higher post-maturity interest rate, a bankruptcy court, sitting as a court of equity, will recognize that a mortgagee, who must forbear from the collection of its claim during the pendency of a reorganization case, is entitled to a "reasonable" post-maturity rate of interest. *In re Hartsdale Associates,* 3 B.C.D. 460, 463–64 (Bkrtcy.S. D.N.Y.1977). In affirming this court, the district court approved the imposition of a higher post-maturity rate and said:

> We believe the sounder argument to be that on the foreclosure of a defaulted mortgage, which is an equitable proceeding (*Seamen's Bank for Savings v. Smadbeck,* 293 N.Y. 91, 56 N.E.2d 46), the rate is to be set in the court's discretion.

452 F.Supp. 67, 69 (S.D.N.Y.1977).

■ In the instant case, the parties expressly agreed in writing as to the post-maturity rate and also stated that the rate to be applied was the maximum allowed by law *at the time of default.* A failure to specify at what point in time the rate of interest on default was to be fixed prevented a mortgagee from collecting a rate of two points over prime in *In re Dye Master Realty, Inc.,* 15 B.R. 932, 935 (Bkrtcy.N.D.N. C.1981). There, a mortgagor defaulted on a note which provided that the post-maturity rate of interest would be the difference between the contract rate and the maximum rate allowed by law. Prior to default, the maximum rate of interest to be charged on corporate mortgages was repealed. The court ruled that the post-maturity rate of interest was the maximum rate allowed by

law at the time the mortgage was entered into because the mortgagee did not specify that the critical time at which the higher rate would be applied was the time of default. In the instant case, the maximum legal rate of interest in effect for corporate borrowers at the time the extension agreement was executed on December 17, 1971 was 25 percent per annum. Individuals and noncorporate borrowers were entitled to the benefit of the 7½ percent ceiling then applicable to bank loans under Banking Board Regulation 4.1. In light of the 25 percent criminal usury ceiling, then in effect, the parties in this case agreed that the maximum rate of post-maturity interest would be the highest rate allowable for this mortgage *at the time of default.* At that subsequent time, there was no maximum ceiling on mortgages. Thus, this court must exercise its discretion and allow a post-maturity rate of interest consistent with the rates of interest chargeable to corporate borrowers on December 17, 1982, when the extension agreement matured.

It appears from the various extension agreements submitted collectively as Exhibit 13, that interest rates for mortgages on apartment units in 1981 ranged between 15½ percent, 19½ percent, Citibank prime and 2 percent over Citibank prime. Therefore, a flexible post-maturity interest rate of 2 percent over prime after December 17, 1981 on a defaulted mortgage is manifestly realistic and commercially acceptable. This is especially true in view of the fact that this was the rate that was offered by the mortgagee to the debtor as consideration for extending the matured mortgage an additional three months after December 17, 1981. It is now nearly two years later and the mortgage continues in default and unpaid.

## CONCLUSIONS OF LAW

1. The post-maturity interest rate properly chargeable upon the matured mortgage after December 17, 1981 is 2 percent above Citibank's floating prime rate, which rate is a fair and equitable rate in the circumstance of this case, consistent with para-

graph 29 of the mortgage extension agreement in question.

2. Such interest, as computed, shall be added to the principal balance due under the mortgage, which was $2,662,328.99 as of October, 1983.

SUBMIT ORDER on notice.

Timothy P. Ruth, Stock & Leader, York, Pa., for plaintiffs.

Donald Swope, York, Pa., for Ness.

John W. Thompson, York, Pa., Trustee.

Daniel Fennick, Central Pennsylvania Legal Services, York, Pa., for defendants.