SNEED, Circuit Judge:
Great Western Bank & Trust (Great Western), an Arizona banking corporation, challenged the Chapter 11 plan filed by Entz-White Lumber & Supply (Entz-White), on the ground that it impermissibly undervalued Entz-White's liability to Great Western. Specifically, Great Western insists that the plan used an incorrect post-maturity interest rate and that it failed to recognize that Entz-White had guaranteed an unpaid personal loan to Jack Entz made by Great Western. The bankruptcy court granted Entz-White’s motion for summary judgment on Great Western's objections to the plan. The district court affirmed, and Great Western now appeals. We affirm the grant of summary judgment.
*1339 I.
FACTS AND PROCEEDINGS BELOW
The source of Great Western’s contentions is, first, a loan of $2 million by Great Western to Entz-White in March 1982. This loan was authorized by a corporate borrowing resolution. Second, at the same time, Great Western made personal loans to Jack Entz, an officer and director of Entz-White, and his wife, who used the proceeds to buy a controlling interest in Entz-White from Jack Entz’s father. Entz-White borrowed another $600,000 from Great Western in February 1983.
Although the loans to Entz-White were to mature in June 1983, Great Western agreed to extend the due date of the loans to June 1984 and to loan another $591,000 to Entz-White on the condition that Entz-White guarantee the personal loans of Jack Entz and his wife to Great Western. On June 1, 1983, Jack Entz executed a corporate guarantee of payment of the personal loans. The third source of Great Western’s claims is that it insists that Entz-White authorized Entz to execute that guarantee. Entz-White says it did no such thing.
Finally, on April 4,1984, Entz-White executed and delivered to Great Western a promissory note in the original principal amount of $3,170,175. The note provided for an interest rate equal to Great Western’s prime rate plus 1.5%. It also provided that “[a]ll obligations hereunder (including principal, interest, costs and fees) not discharged when due or upon ‘demand’ shall bear interest, until paid in full, at the greater of (i) a per annum rate equal to one hundred fifty percent (150%) of the rate set forth above, or (ii) eighteen percent (18%) per annum.” Appellant’s Excerpt of Record (E.R.) at 43. Much of the dispute between the parties with respect to the post-judgment interest rate revolves around the effect of this provision.
The note was due by its own terms on June 1, 1984. Entz-White did not pay the amount due, and filed a Chapter 11 bankruptcy petition on August 17, 1984. On February 25, 1985, the bankruptcy court confirmed Entz-White’s reorganization plan. Pursuant to the plan, Entz-White paid Great Western $3,492,471 on April 26, 1985. This amount included the full principal balance owed as well as interest accrued at the rate of 1.5% in excess of Great Western’s prime. Had Entz-White paid post-default interest at the 18% rate, as Great Western insists it should have, an additional $190,617 would have been paid.
Great Western had filed a secured proof of claim in November 1984, which stated, inter alia, that Entz-White was liable to Great Western for the post-maturity interest and the personal loans to Jack Entz. In June 1985 Entz-White objected to these two portions of Great Western’s claim. The two parties filed cross-motions for summary judgment. The bankruptcy court granted Entz-White’s motion for summary judgment and the district court affirmed in June 1987. Great Western timely appealed.
II.
JURISDICTION
There are no jurisdictional flaws that require attention. The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(B) and the district court’s rested on 28 U.S.C. § 158(a). The decision of the district court was a final decision; therefore, this court has jurisdiction under 28 U.S.C. § 1291. See In re Exennium, Inc., 715 F.2d 1401, 1402 (9th Cir.1983); In re Seidel, 752 F.2d 1382, 1383 (9th Cir.1985).
III.
STANDARD OF REVIEW
The appropriate standard of review is de novo. In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 819 F.2d 214, 215 (9th Cir.1987); see Bankr.R. 7056 (making Fed.R.Civ.P. 56 applicable to summary judgments in bankruptcy proceedings).
IV.
THE POST-MATURITY INTEREST RATE
The Bankruptcy Code broadly states that a Chapter 11 reorganization plan shall *1340 “provide adequate means for the plan's implementation, such as ... curing or waiving of any default.” 11 U.S.C. § 1123(a)(5)(G). The Code does not define “cure.” In In re Taddeo, 685 F.2d 24, 26-27 (2d Cir.1982), the Second Circuit said, “A default is an event in the debtor-creditor relationship which triggers certain consequences .... Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of ‘cure’ used throughout the Bankruptcy Code.” See also In re Metz, 820 F.2d 1495, 1497 (9th Cir.1987) (the cure provisions of Chapter 13 allow “the debtor to ‘cure’ (i.e., pay or bring current) arrear-ages on the debt and thereby reinstate the debt”); In re Clark, 738 F.2d 869, 872 (7th Cir.1984) (“as the term relates to defaults, ‘cure’ means to restore matters to the status quo ante”).[1]
Entz-White argues that its plan, by paying the arrearages on the debt, “cured” its default. It insists that this “cure” nullified any consequences of the default, including a post-maturity higher interest rate. The bankruptcy court and district court agreed with this argument.
Although Entz-White’s argument seems to conform to the broad language of section 1123, Great Western argues that this appearance is deceiving, and that a closer reading of the Code reveals that Congress intended to allow debtors to cure only those defaults the consequences of which are solely acceleration of the remaining payments due. Default on the Entz-White debt had no such consequence. The note of Entz-White naturally “matured” before it filed for bankruptcy. Entz-White, therefore, must pay the higher rate of interest provided for by the terms of the contract. This rate is not a “consequence” of default.[2]
Great Western points to 11 U.S.C. § 1124, which determines whether a party is impaired by a Chapter 11 reorganization plan.[3] Subsection 1124(2), in pertinent part, states:
[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
(A) cures any such default that occurred before or after the commencement of the case under this title ...;
*1341 (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest. ...
Great Western points to the “notwithstanding” clause of subsection (2) to support its claim that “cure” is applicable only to obligations that have been accelerated due to default. We find this a strained reading of the statute, as did the bankruptcy court and district court. Section 1123 speaks of “any default” while the notwithstanding clause of section 1124 refers to “a default.” The natural reading of these sections is that plans may cure all defaults [4] without impairing the creditor’s claim, and that such defaults include, but are not limited to, those defaults resulting in acceleration. See R. Broude, Reorganizations Under Chapter 11 of the Bankruptcy Code § 10.02[2], at 10-7 (1987) (“[W]ith respect to any monetary defaults (or indeed any kind of default other than one resulting from the filing of the bankruptcy case accompanied by an ipso facto or similar type clause), the default can and must be cured.”); Taddeo, 685 F.2d at 28-29 (“[C]uring a default, even though it inevitably changes a contractual acceleration clause, does not thereby ‘impair’ a creditor’s claim.”) (emphasis added).
Great Western, in support of its narrow reading of the statute, cites the Senate Report on the bill that became section 1124, which states that “a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default.” S.Rep. No. 95-989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5906 (emphasis added). Great Western argues that this language shows that Congress intended to limit the section to defaults that result in acceleration. We reject this argument for two reasons. First, a basic rule of statutory construction is that “[ajbsent a clearly expressed legislative intention to the contrary, [the language of the statute] must ordinarily be regarded as conclusive.” American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (quoting Consumer Product Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). This phrase from the Senate Report is not clearly contrary to the broad statutory language. It shows only that the drafters in the Senate were concerned primarily with defaults resulting in acceleration; it does not show that they meant to confine the section to that situation. Second, the House Report on the section states that section 1124 permits a bankruptcy plan “to reinstate a claim or interest and thus leave it unimpaired. Reinstatement consists of curing any default (other than a default under an ipso facto or bankruptcy clause) and reinstatement of the maturity of the claim or interest.” H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 408 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6364 (quoted in 5 L. King, Collier on Bankruptcy ¶ 1124.01, at 1124-4 (15th ed. 1988) (emphasis added)). This broad language, subject only to two listed exceptions, mirrors the language of the statute and refutes Great Western’s position.
Finally, Great Western argues that In re Seidel, 752 F.2d 1382 (9th Cir.1985), limits the cure provisions to cures of defaults that result in acceleration. Like this case, Seidel involved a promissory note that had naturally matured before the debtor filed for bankruptcy. The debtor defaulted on the debt, and then attempted to use a Chapter 13 plan to cure the default.[5] The plan *1342 allowed the debtor to delay payment of the debt over a five-year period. The court agreed with the creditor that the plan im-permissibly modified its claim. The court said:
“[T]he plain meaning of ‘cure,’ as used in § 1322(b)(3) and (5), is to remedy or rectify the default and restore matters to the status quo ante.” Clark, 738 F.2d at 872; Taddeo, 685 F.2d at 26-27. When a debt has been accelerated, “cure” therefore results in the reinstatement of the original payment terms of the debt. But when a debt has already naturally matured — as in Seidel’s case — “cure” as defined by these courts cannot aid the debt- or, since reinstatement of the original terms of the debt will merely make the debt immediately due and payable.
752 F.2d at 1386.
Great Western has fastened on the reference to an “accelerated” debt and missed the point made by the foregoing paragraph. Unlike the debtor’s plan in Seidel, Entz-White’s plan did make its debt “immediately due and payable,” and Entz-White has now paid off the debt. Entz-White’s plan therefore did precisely what Seidel requires. As the district court said in this case, “Seidel, when read in the context of the ‘cure’ cases from other circuits, leaves open the possibility of curing a defaulted naturally matured loan by tendering the due and payable loan amount immediately.” [6]
And, by curing the default, Entz-White is entitled to avoid all consequences of the default — including higher post-default interest rates. This result is consistent with the treatment by other courts of the Bankruptcy Code’s cure provisions. While it is true that most cases in this area have involved a default resulting in acceleration, none of which we are aware have treated acceleration as the only possible consequence of default. See, e.g., Taddeo, 685 F.2d at 26 (“A default is an event in the debtor-creditor relationship which triggers certain consequences — here, acceleration.”); Clark, 738 F.2d at 872 (“Acceleration of a debt is a standard consequence of a default in payments.”); see also In re Forest Hills Assocs., 40 B.R. 410, 415 (Bankr.S.D.N.Y.1984) (“just as the debtor need not pay the post-default accelerated debt, he need not pay the post-default interest rate on the accelerated debt”). It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest.
Great Western’s three additional arguments may be disposed of more quickly. First, it argues that even if the Code allows cure in this case, Entz-White must nevertheless pay the post-maturity interest rate on the delayed debt. It reasons that cure requires reinstatement of the original terms of the debt, and the original terms of the debt include a provision that unpaid principal after June 1,1984 accrues interest at a higher rate. This argument is spurious. It amounts to saying, once more, that the higher rate of interest is not a consequence of default that can be cured.
Second, Great Western points to 11 U.S. C. § 506(b), which states:
To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section [covering administrative costs], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
Great Western asserts that it is an overse-cured creditor and as such is entitled under section 506(b) to interest on its claim that should be determined by the terms of the contract, including the post-default interest rate, between Great Western and Entz-White.
*1343 The reorganization plan’s payment to Great Western did allow the holder of the claim interest accrued thereon.[7] It did not, of course, allow the post-default rate. To have done so would have completely eliminated the benefits of cure in this case. Great Western cites no case endorsing such a result.[8] The more natural reading of sections 506 and 1124 is that the interest awarded should be at the market rate or at the pre-default rate provided for in the contract.[9] See In re Southeast Co., 81 B.R. 587, 592 (BAP 9th Cir.1987) (holding that reliance damage under section 1124(2)(C) “does not comprise contractual penalty interest rates”). Once more Great Western’s argument fails.
Finally, Great Western points to section 1129(a)(7), which provides that a plan may not be confirmed unless the holder of an impaired claim receives the amount that it would receive were the debtor’s estate liquidated under Chapter 7. This yields no fruit for Great Western. It is an unimpaired creditor under section 1124.[10]
Y.
RATIFICATION OF JACK ENTZ’S PERSONAL LOANS
Summary judgment was entered against Great Western on its claim that Entz-White guaranteed the personal indebtedness of Jack Entz and his wife. Great Western now argues that genuine issues of material fact exist which make the entry of summary judgment improper. We disagree.
Great Western and Entz-White agree that Ariz.Rev.Stat. § 10-047 (1977) controls this issue. It states: *1344 Although the parties disagree over the precise scope of this statute, they agree that it “requires either shareholder or director action to authorize a loan or credit benefit to either a director or employee-director.” Bankruptcy Court Opinion, E.R. at 26.
*1343 A corporation shall not lend money to or use its credit to assist its directors without authorization in the particular case by its shareholders, but may lend money to and use its credit to assist any employee of the corporation or of an affiliate corporation, including any such employee who is a director of the corporation, if the board of directors decides that such loan or assistance may reasonably be expected to benefit the corporation.
*1344 Great Western asserts that a genuine issue exists as to whether Entz-White gave such authorization to Jack Entz. It points to the corporate minutes of Entz-White, which state that a corporate borrowing resolution was unanimously approved at the shareholders’ meeting on May 18, 1983. However, no copy of the resolution is in the minutes, nor has a copy been produced. Also neither party presented testimony as to the content of the resolution. Great Western, to tilt the scales back toward genuine doubt, points out that the resolution was adopted shortly before Jack Entz’s June 1, 1983 execution of the disputed corporate guarantee. It asserts that proximity in time alone is enough to create a genuine issue of material fact. However, it points to no testimony that the resolution in question authorized a corporate guarantee of the Entzes’ loans. Moreover, the minority directors testified that although they could not remember the content of the May 18, 1983 resolution, they were both vehemently opposed to a corporate guarantee of the Entzes’ loans. Great Western does not contradict this testimony. As yet no genuine issue of material fact exists.
Great Western also points to two corporate borrowing resolutions adopted by the directors in April 1982 and March 1984. But neither of these resolutions authorized Jack Entz to execute a corporate guarantee of his personal loans. The bankruptcy court stated:
The only reference in these resolutions to a guarantee is limited to the guaranteeing of the payment of notes payable to the corporation that have been discounted or sold to the Bank, and guarantees in connection with Bank letters of credit.... This precise description of two instances in which corporate guarantees are authorized implies that other guarantees are not authorized. Under the rule of ejvsdem generis, “the meaning of the general terms is presumed to be limited to the enumerated specific terms and to include only those things of the same nature as those specifically enumerated unless a clear manifestation of a contrary intent is apparent.”
E.R. at 25 (quoting United California Bank v. Prudential Ins. Co., 140 Ariz. 238, 273, 681 P.2d 390 (App.1983)). Great Western does not seriously dispute the court’s reasoning. Rather, it invokes the doctrine of ratification by pointing to a resolution on a standard form that stated that “all prior acts of the officers of the corporation in borrowing money, in selling, assigning, or discounting property of the corporation, or in incurring other obligations to [Great Western], and the execution of any and all instruments and agreements by them, are hereby ratified, confirmed, and approved.” E.R. at 44. Under Arizona law, however, “[ratification requires that a principal have full and actual knowledge of all material facts at the time he, by subsequent act or conduct, binds himself to a previously unauthorized act of an agent.” Murdock-Bryant Constr., Inc. v. Pearson, 146 Ariz. 57, 64, 703 P.2d 1206, 1213 (Ariz.App.1984); see Phoenix Western Holding Corp. v. Gleeson, 18 Ariz.App. 60, 66, 500 P.2d 320, 326 (1972). Entz-White contends that the minority shareholders did not know of the guarantee until after the bankruptcy filing. The bankruptcy court agreed. Great Western says that “this assertion flies in the face of numerous facts in the record,” but it can point to nothing in the record to the contrary. The issue of ratification or no fails to become a “genuine” one.
Great Western further insists that by accepting the benefit of the loans from Great Western to Entz-White, the directors implicitly ratified Entz’s guarantee. Arizona does recognize this implicit ratification, but once again Great Western stumbles. Implicit ratification exists only when the directors have knowledge of the material facts of the act that they are ratifying. See Phoenix Western, 18 Ariz.App. at 66, 500 P.2d at 326 (“a ratification can occur by acceptance of the benefits of an allegedly *1345 unauthorized act when accompanied by knowledge of material facts”).
Great Western argues that their knowledge after the filing of bankruptcy, coupled with their continued acceptance of the benefits of the loans to the corporation, is enough to ratify the guarantee. Great Western cites no case supporting this argument and we have found none. After a bankruptcy filing, of course, the powers of directors are limited. Great Western does not explain how the directors could have renounced the use of the loans once the corporation was in Chapter 11.
Finally, Great Western contends that Jack Entz’s knowledge of the guarantee could be imputed to the corporation because he was an officer. This flies in the face of the Arizona statute. To permit an officer’s knowledge of an unauthorized loan to himself to ratify the loan would contravene the statute’s requirement that authorization be by the directors or shareholders. Moreover, even in the absence of Arizona’s section 10-047, a principal under agency law would not be “affected by the knowledge of the person who did the unauthorized act as to the facts involved in the transaction, even though such person is an agent whose duty it would be to report to the principal all the facts concerning the transaction.” Restatement Second of Agency § 91, comment c (1958).
We agree with the courts below that Great Western created no genuine issue of material fact with respect to whether Entz-White guaranteed Great Western’s personal loans to the Entzes.
AFFIRMED.

. Taddeo, Metz, and Clark involve cure under Chapter 13, rather than Chapter 11. Although Chapter 13 restricts allowable cures in ways that Chapter 11 does not, the underlying concept of cure is the same throughout the Bankruptcy Code. See Taddeo, 685 F.2d at 27.

. At oral argument, Great Western also argued that Entz-White never actually defaulted on the loan, and compared the note to a line of credit which would allow the debtor to extend the due date. Black’s Law Dictionary (5th ed. 1979) defines "default” as “[a]n omission of that which ought to be done. Specifically, the omission or failure to perform a legal or contractual duty, to observe a promise or discharge an obligation (e.g. to pay interest or principal on a debt when due), or to perform an agreement." See also Horn & Hardart Co. v. National R.R. Passenger Corp., 659 F.Supp. 1258, 1268 (D.D.C.1987). Great Western admits that Entz-White did not make the June payment when due, and that the note was not the equivalent of a line of credit. Entz-White's failure to pay the principal when due was a default.

.Only impaired parties have the right to vote on the reorganization plan. "A class which is not impaired under section 1124 is conclusively presumed to have accepted the plan_” 5 L. King, Collier on Bankruptcy ¶ 1124.03, at 1124-10 (15th ed. 1988). “[SJection 1124(2) permits the plan to reinstate the original maturity of the claim or interest as it existed before the default without impairing such claim or interest.” In re Madison Hotel Assocs., 749 F.2d 410, 420 (7th Cir.1984) (quoting 5 L. King, Collier on Bankruptcy H 1124.03(2], at 1124-14 (15th ed. 1979)); see In re Metz. 820 F.2d 1495, 1497 (9th Cir.1987).
Great Western ignores the broad language of § 1123, which would appear to allow debtors to cure this type of default even if a party with a claim cured in this way would be impaired under § 1124. Because of our resolution of the § 1124 issue, we need not address the consequences that would result if we were to find that § 1123 allows this type of cure but that § 1124 defines Great Western as an impaired party.

. Except for certain types of default enumerated in the statute.

. Entz-White does not argue that Seidel’s focus on Chapter 13 makes it inapplicable to this case. See note 1, supra.

. The district court went on to say, “The term ‘immediately’ in Seidel must be read as immediately upon confirmation of the reorganization plan, since it was obviously not possible to go back in time to pay the loan amount when originally due.” E.R. at 8.

. Neither the parties nor the courts below discuss whether Great Western’s equity cushion is sufficient to absorb the interest payments, as § 506(b) requires. However, it appears that whether or not the interest payments are required by § 506(b), they would be required by § 1124(2)(C), which requires the plan to "compensate[ ] the holder of [a] claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law." Courts have read this subsection as requiring interest on nonaccelerated, overdue debt. See In re Forest Hilts Assocs., 40 B.R. 410, 414-15 (Bankr.S.D. N.Y.1984). Therefore, even if § 506(b) did not apply to Great Western, § 1124 would still require interest on the overdue debt. See generally In re Arlington Village Partners, Ltd., 66 B.R. 308 (Bankr.S.D.Ohio 1986) (discussing the interplay of § 506(b) and § 1124(2)(C)).

. In re Berry Estates, Inc., 34 B.R. 612 (S.D.N.Y. 1983), which Great Western cites in support of its position, does not involve a cure of a default, and is therefore inapposite to this case.
Great Western cites In re American Mariner Indus., Inc., 734 F.2d 426 (9th Cir.1984), for the proposition that “adequate protection" requires Entz-White to pay Great Western interest at the contractual post-default rate. American Mariner is no longer good law. See United Savings Ass’n v. Timbers of Inwood Forest Assocs., Ltd., — U.S. -, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); Cimarron Investors v. WYID Properties, 848 F.2d 974 (9th Cir.1988). Even if it were, however, it would not help Great Western here. American Mariner was concerned with protecting undersecured creditors; it recognized that § 506(b) protects oversecured creditors by allowing them to receive interest at the rate agreed on in the contract. 734 F.2d at 435 n. 12; see In re Anderson, 833 F.2d 834, 836 (9th Cir.1987). American Mariner simply does not cover the present case, where we are faced with a choice between two contractual rates in the context of a Chapter 11 cure.

. We continue, of course, to recognize bankruptcy courts’ “broad equitable discretion” in awarding post-petition interest. See In re Anderson, 833 F.2d 834, 836 (9th Cir.1987).

. Our resolution of the above issues makes it unnecessary for us to reach Entz-White’s argument that the equitable principles enunciated in Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), prevent Great Western from recovering default interest "if payment of it would disadvantage unsecured creditors.” Appellee’s Brief at 24.