**IN RE: David N. CATTON, Debtor.**

**Bankruptcy Case No. 11–15069–CL11**

United States Bankruptcy Court,
S.D. California.

Signed August 9, 2016

Andrew J. Miller, Thomas S. Engel, San Diego, CA, for Debtor.

## MEMORANDUM DECISION AND ORDER ON CONFIRMATION

CHRISTOPHER B. LATHAM, JUDGE, United States Bankruptcy Court

The court has considered debtor David N. Catton ("Debtor") and the Catton Family Trust's (the "Trust") motion for approval of their joint Chapter 11 plan of reorganization (the "Plan"), U.S. Bank, N.A.'s ("U.S.Bank"). opposition, Sharon Investments' ("Sharon") opposition, the Trust's reply, counsel's oral argument, and Sharon's and the Trust's supplemental briefs.

The parties dispute whether *Entz–White* applies to the Plan's treatment of Sharon and U.S. Bank's claims. Debtor and the Trust essentially contend that *Entz–White* entitles Debtor to a credit of approximately $176,000 from U.S. Bank and $73,743 from Sharon. The court disagrees.

### I. JURISDICTION AND VENUE

The court has jurisdiction to hear and determine this matter under 28 U.S.C. § 157(b)(2)(L) and 1334(b). Venue is

proper in the Southern District of California under 28 U.S.C. § 1409(a).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Prepetition, Debtor owned and operated income-producing properties. These holdings included a 22–unit apartment building at 1714 Grove Street, San Diego, CA 92102 (the "Grove Street Property") and a 7–unit apartment building at 7530 North Avenue, Lemon Grove, CA 91945 (the "North Avenue Property"). U.S. Bank holds the first position trust deed in the Grove Street Property, securing a $1,500,000 loan. About January 13, 2009, Sharon lent Debtor $500,000. The loan was secured by a cross-collateralized trust deed on the Grove Street Property in second position and the North Avenue Property in first position.

About February 1, 2010, Debtor's obligation to Sharon matured. But Sharon and Debtor entered into a series of extension agreements. On April 14, 2011, Sharon recorded a notice of default with the San Diego County Recorder's Office. On August 9, 2011, it recorded a notice of sale and scheduled the foreclosure sale for September 9, 2011. Debtor had also defaulted on his obligation to U.S. Bank. And U.S. Bank, also on August 9, 2011, recorded a notice of default and election to sell.

On September 8, 2011, Debtor filed the present voluntary Chapter 11 petition. ECF No. 1. U.S. Bank promptly filed a notice of non-consent to Debtor's using its cash collateral. ECF No. 11. On December 14, 2011, Debtor moved to sell the North Avenue property and pay Sharon a portion of the proceeds. ECF No. 46. On January 16, 2012, the court granted the motion and entered an order. ECF No. 71. It authorized escrow to disburse approximately $490,853.53 to Sharon. *Id.*, pp. 2, 6. It also authorized escrow "to

execute any other documents necessary for Sharon Investments to transfer any deficiency owed to it from said sale to it's perfected security interest in the real property located at 1714 Grove St., San Diego, CA 92102." *Id.*, p. 2.

On January 16, 2012, Debtor and U.S. Bank stipulated to use of cash collateral, which the court approved. ECF Nos. 62 and 63. On March 1, 2012, Debtor, U.S. Bank, Sharon, and other secured parties entered into a stipulated agreement requiring Debtor to, among other things, appoint a property manager for the Grove Street Property and disburse adequate protection payments to the secured creditors. ECF No. 87. The court approved the stipulation. ECF No. 89. Although the $490,853.53 disbursement to Sharon did not fully pay off Sharon's claim, Sharon stopped charging Debtor default interest and instead allowed interest to accrue at the note rate. On March 14, 2013, Sharon filed Claim No. 22–1, asserting a $102,567 secured claim. Claim No. 22–1.

On July 2, 2013, U.S. Bank moved to appoint an examiner with power to sell the Grove Street Property, to appoint a Chapter 11 examiner with power to sell the property, or for an order to sell the property. ECF No. 198. On July 8, 2013, Sharon filed its own motion to appoint an examiner to sell the property or for an order to sell the property. ECF No. 200. Sharon also joined in U.S. Bank's motion. ECF No. 203.

On October 2, 2013, Debtor, U.S. Bank, and Sharon—in response to the motions—stipulated that Debtor would direct the Grove Street Property's manager to disburse $85,000 to U.S. Bank and $8,000 to Sharon. ECF No. 221. The manager would also disburse $11,024 to U.S. Bank and $1,000 to Sharon per month. *Id.* That same day, the court approved the stipulation. ECF No. 222. On April 7,

2014, Debtor, U.S. Bank, and Sharon entered into a further, amended stipulation about the Grove Street Property that increased the amount of the monthly payments to U.S. Bank and Sharon. ECF No. 248. The court approved it the next day. ECF No. 249.

On September 8, 2014, Debtor brought the principal and interest due on his obligation to U.S. Bank current. Although Debtor was still delinquent on fees and costs, U.S. Bank converted the interest rate back to the note rate and rescinded its notice of default. In July 2015, Debtor brought the U.S. Bank loan fully current, except for legal fees and costs.

On March 1, 2016, the court approved Debtor and the Trust's proposed disclosure statement. ECF Nos. 382 and 387. On March 14, 2016, Debtor and the Trust filed their combined Chapter 11 plan and disclosure statement (the "Plan"). ECF No. 387. The Plan describes U.S. Bank and Sharon's claims and treats them as follows:

> Debtor will pay the entire amount contractually due (on non-default terms) by making all post-confirmation regular monthly payments, and by paying all pre-confirmation arrears on the above secured claims (including attorney's fees) on the Effective Date of the Plan. *See Entz–White Lumber & Supply, Inc. v. Great Western Bank & Trust,* 850 F.2d 1338 (9th Cir.1988). Debtor will pay property taxes and insurance for the subject collateral directly upon the Effective Date of the Plan. Creditors in these classes shall retain their interest in the collateral until paid in full. Sharon Investment will be paid in full on its allowed claim, which payment shall entitle the Debtor to a credit for all default-related payments previously made. U.S. Bank will be paid in full on the only known arrears, namely allowed legal

fees, and upon payment will be entitled to a credit for all default-related payments previously made.

ECF No. 426, p. 11; ECF No. 387, p. 5. It further clarifies:

> The proponents intend to seek confirmation of the Plan even if the court rules that Section 1123 and the *Entz–White* doctrine cannot be applied to or invoked as to U.S. Bank and Sharon Investment. The treatments for the two classes after the application of the *Entz White* doctrine, to whatever degree, will be a full payment to Sharon Investment on the amount owing on the Effective Date and continued payment to U.S. Bank as called for by its loan documents. Payments to U.S. Bank will continue past the date Debtor obtains a discharge. The claimant's rights against its collateral shall not be affected by tire entry of discharge, but shall continue to be governed by the terms of this plan.

ECF No. 425, p. 11; ECF No, 387, p. 5. The Plan also states that the "Effective Date of the Plan is the fifteenth day following the date of the entry of the order of confirmation." ECF No. 426, p. 17; ECF No. 387, p. 11. U.S. Bank and Sharon objected to the Plan; each argued that *Entz–White* should not apply to their claims. ECF Nos. 401 and 402.

The court held a confirmation hearing on May 2, 2016. ECF No. 417. It confirmed the plan but, with the parties' consent, took the *Entz–White* issue under submission. ECF No. 417; ECF No. 426, pp, 1, 4. The court also directed the Trust and Sharon to submit supplemental briefing about whether Sharon charged Debtor default interest after the North Avenue Property sale. ECF No. 417. The parties timely filed their supplemental briefs. ECF Nos. 430 and 431.

## III. LEGAL STANDARD

■ In bankruptcy, " '[c]reditors' entitlements ... arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.' " *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (quoting *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000)).

The code authorizes a Chapter 11 debtor-in-possession to sell estate property. 11 U.S.C. §§ 363, 1107. And a Chapter 11 debtor-in-possession may file a plan of reorganization. 11 U.S.C. § 1121(a).

■ Section 1123(a) provides that, "[n]othwithstanding any otherwise applicable nonbankruptcy law, a plan shall" do a number of things. 11 U.S.C. § 1123(a). The plan must classify claims and specify if a class is not impaired under the plan. 11 U.S.C. § 1123(a)(1), (2). The plan also shall "provide adequate means for the plan's implementation, such as—... (G) curing or waiving of any default...." 11 U.S.C. 1123(a)(5). The Code, however, does not define "cure." *See generally* 11 U.S.C. § 101. The Ninth Circuit has adopted the Second Circuit's definition:

> A default is an event in the debtor-creditor relationship which triggers certain consequences.... Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code.

*In re Entz–White Lumber & Supply, Inc.*, 850 F.2d 1338, 1340 (9th Cir.1988) (quoting *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982)). When a debtor cures a default through a plan, the debtor "is entitled to avoid all consequences of the default...."

*Id.* at 1342. Put slightly differently: "It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." *Id.*

## IV. LEGAL ANALYSIS AND CONCLUSIONS

The Trust's position is elegantly simple. It argues that § 1123(a)(5)(G) allows Debtor to cure or waive defaults. It contends that *Entz–White*, in turn, authorizes the Plan to nullify all consequences of the default, including accrual and payment of default interest and penalties. The Trust estimates that Debtor has paid Sharon approximately $73,743 in default interest and U.S. Bank $176,000. Thus, it asserts that Debtor is entitled to a corresponding credit from each. It argues: "If Debtor is not credited for the default interest paid, then the cure of his default will not be nullified." ECF No. 412, p. 11. U.S. Bank and Sharon, naturally, disagree. The court will consider each position in turn, but begins with a brief exposition of two relevant Ninth Circuit opinions: *Entz–White* and *General Electric Capital Corporation v. Future Media Productions, Inc.*, 547 F.3d 956 (9th Cir.2008).

In *Entz–White*, debtor defaulted on an obligation to a secured creditor; the full amount owing became due pre-petition. 850 F.2d at 1339. Instead of paying the note, debtor filed for bankruptcy protection. *Id.* The secured creditor sought to recover interest at the note's default rate. Debtor proposed and confirmed a plan that paid the creditor only at the note's regular rate. *Id.* On appeal, the Ninth Circuit agreed with the debtor's position and interpreted the code broadly. *Id.* at 1339–40. It explained that when a debtor cures a default through a plan, the bankruptcy code "authorizes a plan to nullify all

consequences of default, including avoidance of default penalties such as higher interest." *Id.* at 1342.

Some twenty years later, the Ninth Circuit decided *Future Media*, 547 F.3d at 956. There, debtor entered bankruptcy after defaulting on a loan to an oversecured creditor. 547 F.3d at 958. Debtor owed that creditor interest at both the note and default rate. *Id.* The parties entered into a cash collateral stipulation, and debtor agreed not to dispute the obligation's amount. *Id.* The stipulation drew opposition from the unsecured creditors' committee. *Id.* at 958–59. Everyone eventually agreed that the oversecured creditor could be in paid in full, but they would litigate whether it was entitled to default interest at a later date. *Id.* at 959. The bankruptcy court ultimately held that *Entz–White* applied and that the oversecured creditor must return the default interest. *Id.* The Ninth Circuit reversed. It framed the issue succinctly:

> In *Entz–White*, we announced the rule that an oversecured creditor was not entitled to interest at the default rate where its claim was paid in full *pursuant to the terms of a Chapter 11 plan. Entz–White*, 850 F.2d at 1342. In the case at bar, the bankruptcy court extended *Entz–White* to a claim that was paid in full as a result of a series of asset sales *outside of a Chapter 11 plan.*

*Id.* at 960 (footnote omitted). And it held that, "[b]ecause a Chapter 11 plan implicates provisions of the Bankruptcy Code that an asset sale outside of a plan does not, we respectfully conclude that the bankruptcy court's extension of *Entz–White* was error." *Id.* at 960.

### A. U.S. Bank's Claim

■ U.S. Bank argues that *Entz–White* does not apply because the loan is not delinquent—it has been current since September 2014. Accordingly, it contends that the Plan's implementation will not cure the default because there is no default to cure. The Trust argues the Plan cures U.S. Bank's claim because it pays outstanding attorneys' fees and costs.

The court agrees with U.S. Bank. Section 1123(a)(5)(G), and thus *Entz–White*, does not apply. Section 1123(a)(5)(G) provides that the *Plan* may cure or waive a default. To repeat, as explained in *Entz–White:* "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." 850 F.2d at 1340 (quoting *In re Taddeo*, 685 F.2d at 26–27). For § 1123(a)(5)(G) to apply, then, there must be a presently existing default on the Plan's effective date.

U.S. Bank asserted, and neither Debtor nor the Trust dispute, that the loan has been current since September 2014 and U.S. Bank has not charged Debtor default interest since then. Further, U.S. Bank rescinded its notice of default. The Plan thus does not cure the default. Instead, Debtor's normal course payments *and* Debtor's (and the property manager's) payments on the various stipulated orders "cured" the default (i.e., took care of the triggering event) by bringing the loan current. Accordingly, § 1123(a)(5)(G)—and *Entz–White's* accompanying per se rule— does not apply to U.S. Bank's claim. *Cf. Future Media*, 547 F.3d at 960 ("As a result, the facts of *Entz–White* are distinguishable, and thus our per se rule from that case is inapplicable."). Simply, there is no default for the plan to cure.

The Trust's counter-argument is not persuasive. It very well may be right that if a plan is to cure an oversecured claim based on a defaulted, non-matured loan, then the plan must pay that secured credi-

tor's attorneys' fees and costs. But this does not mean that if an oversecured creditor can recover and is owed attorneys' fees and costs, then the underlying loan is in default.

U.S. Bank also argues that Debtor is not entitled to a "credit" or return of the default interest already paid. Instead, it urges, when the Plan does not cure, the bankruptcy court must apply the presumptive rule and, in the absence of a code provision allowing otherwise, award it default interest. U.S. Bank cites both *Future Media* and a recent BAP case, *In re Beltway One Development Group, LLC*, 547 B.R. 819, 827 (9th Cir. BAP 2016). The Trust addresses this by simply reiterating that the Plan cures U.S. Bank's claim: "If Debtor is not credited for the default interest paid, then the cure of his default will not be nullified." ECF No. 412, p. 11. But the court has already determined that § 1123(a)(5)(G), and thus *Entz–White*, does not apply. Consequently, the Trust's argument fails to respond to U.S. Bank's assertion that it was entitled to the default interest it collected before and during this case's pendency. *See infra*, p. 8.

The court therefore finds that *Entz–White* does not apply to U.S. Bank's claim. Debtor is thus not entitled to a credit for any default interest paid to it.

### B. Sharon's Claim

Sharon argues: first, that it is entitled to default interest through § 502(b) because it is an oversecured creditor; second, that its position is governed by *Future Media* and not *Entz–White*; and, third, that Debtor did not object to the payment of default interest in the sale. The Trust asserts that *Entz–White* applies because the Plan is curing Sharon's claim in full on the effective date—and this distinguishes *Future Media*, which involved a sale. It also contends that Debtor did not need to reserve the right to cure Sharon's claim through the plan: "Treating prior payments to secured creditors as estopping Debtor from curing the secured claims at a later time would disincentivize debtors from making payments to secured creditors prior to confirming a plan, which benefits no one." ECF No. 412, p. 9. The Trust and Sharon both agree that, following the § 363 sale of the North Avenue Property, Sharon did not charge Debtor interest at the default rate. The Trust also argues, and Sharon does not dispute, that Sharon is unimpaired under the plan.

The court disagrees with both Sharon and the Trust. Neither *Entz–White* nor *Future Media* is factually apposite. *Entz–White* involved curing a default through § 1123(a)(5)(G) and paying a claim in full through a Chapter 11 plan. *Future Media*, on the other hand, concerned paying a claim in full through asset sales. The case at bar entails paying an oversecured creditor, Sharon, through an asset sale and a plan. Accordingly, *Entz–White* is factually inapplicable and the court is not obligated to apply its per se rule. That said, the Trust is correct that *Future Media* is distinguishable both because the North Avenue Sale did not pay Sharon's claim in full and because the Plan is, in the final event, curing the default by retiring the note.

The court now considers how Sharon's claim should be treated. It adopts a hybrid approach, which applies *Future Media* to Debtor's § 363 sale and corresponding payment to Sharon, and concludes that *Entz–White* might apply to the Plan's payment.

As an initial matter, Sharon's blanket assertion that it is entitled as an oversecured creditor to default interest under § 506(b) is not persuasive. What's more, if *Entz–White* applies, Sharon is

plainly wrong—the Ninth Circuit rejected this argument in *Entz–White*. *See* 850 F.2d at 1342–43; *In re Udhus*, 218 B.R. 513, 516 (9th Cir. BAP 1998) ("The court of appeals [in *Entz–White* ] explains why default interest is not allowable under § 506(b) or § 1124(2)(A).... Under *Entz–White*, a § 1123 cure corrects all defaults and prohibits an award of default interest. The case also denied default interest under § 506(b).").

On the other hand, *Future Media* does not hold that, if *Entz–White* does not apply, the court should allow default interest. Instead, the Ninth Circuit remanded for the bankruptcy court to determine whether interest should accrue at the default rate. 547 F.3d at 961–62. But the Trust does not otherwise dispute that default interest was proper (i.e., it does not point to a qualifying or contrary provision of the bankruptcy code, *cf. id.* at 960, or contend that the default rate is not allowable under applicable nonbankruptcy law, *cf. id.* at 961). The Trust's entire argument hinges on *Entz–White'* s pertinency.

■ The court holds that *Entz–White* does not apply to the North Avenue Property sale and Debtor's payment to Sharon of default interest on account of it. First, that order is final. Debtor himself proposed to make this payment to Sharon in the papers. The sale was, so far as the court can tell, entirely consensual. The court approved it as non-contested, and the sale order allowed a $490,853.53 disbursement to Sharon. The Plan cannot now (more than four years later) disturb or unwind that sale, much less Debtor's payment to Sharon of default interest as part of it.

Second, a § 363 sale does not involve "curing" events of default. *Future Media*, 547 F.3d at 961 ("The problem with that transposition is that the text of § 363 does not mention 'cure' and the procedures set out in that section do not implicate the concept of 'cure.' In short, there is no 'cure' of events of default, de facto or otherwise, in the context of an asset sale." (citation omitted)). Accordingly, § 363 sale cannot "nullify all consequences of default." Debtor proceeded in stages through this bankruptcy case. He did not immediately seek confirmation of the Plan. He chose to sell the North Avenue Property through a § 363 sale and not through a Plan. Having moved under § 363, he cannot now invoke § 1123 retrospectively.[1]

As a practical matter, Sharon treated its receipt of $490,853.53 from that sale as curing the default and, presumably in a gesture of good faith, thereafter only charged Debtor interest at the note rate. Nevertheless, the note was still in default after the sale—it matured prepetition and had not yet been paid in full. And, four years later, when Debtor proposed and is now confirming a Plan, the note remains in default. The Plan proposes to cure that default by paying Sharon's claim in full. And because this occurs through the Plan, the court concludes that *Entz–White* might apply.

For the Trust, though, this is an ephemeral victory, Debtor did not pay Sharon default interest after the sale. Accordingly, even if the court holds that Debtor is entitled to cure the default by paying off Sharon's claim, he is *factually* not entitled to credit[2] for any default interest because

1. Further, Sharon's claim was secured by an interest in the North Avenue Property. It received default interest on account of that interest. After the § 363 sale, the property left the bankruptcy estate. The court strug-

gles to see how it could now restructure Sharon and Debtor's relationship vis-à-vis non-estate property.

2. "Credit" is an accurate description of the Plan, but it masks the practical effect, which

Sharon did not charge him (nor did he pay) default interest after the sale. The court thus leaves open, without deciding, whether *Entz–White* allows a debtor to a credit for payments already made; Debtor cites no case applying *Entz–White* this way.[3]

The court also need not consider the effect of Debtor's stipulations with Sharon. The Trust's estoppel argument is not well taken. Debtor's incentives were rightly aligned. He presumably agreed to pay U.S. Bank and Sharon to resolve their motions to convert or appoint an examiner or Chapter 11 Trustee. That said, Sharon does not develop a full-fledged estoppel analysis, and the court is not inclined to craft that legal argument for Sharon *sua sponte*.

## V. CONCLUSION

For the foregoing reasons, the court holds that § 1123(a)(5)(G), and thus *Entz–White*, does not apply when a debtor brings a defaulted loan current during a bankruptcy case. The court also holds that *Entz–White* does not authorize a debtor, through a plan, to disturb a final § 363 sale order. It thus **finds** that Debtor is not entitled to a credit for the default interest he paid to either U.S. Bank or Sharon.

IT IS SO ORDERED.

is to claw back funds that Debtor already paid. Sharon estimates that as of January 1, 2016, Debtor owes it $68,861. ECF No. 402, p. 3. Debtor estimates that he would be entitled to a $73,743 credit from Sharon. ECF No. 412, p. 9. Sharon would then owe Debtor.

3. In *Future Media*, the parties stipulated that the oversecured creditor would be paid in full, including default interest, but they agreed that the bankruptcy court would later determine whether the oversecured creditor could keep the default interest. 547 F.3d at 959.