In re LHD REALTY CORPORATION,
Debtor.

LHD REALTY CORPORATION,
Plaintiff,

v.

NATIONAL LIFE INSURANCE COMPA-
NY, Treasurer, Marion County, State of
Indiana, Department of Revenue, Mi-
chael L. Nickerson, Merchants National
Bank & Trust Company of Indianapolis,
Defendants.

Bankruptcy No. IP80–2510RA.
Adv. No. 81–1428.

United States Bankruptcy Court,
S. D. Indiana,
Indianapolis Division.

April 9, 1982.

723

John R. Carr, Jr., and Stephen R. Busch-mann, Indianapolis, Ind., for LHD Realty Corp. and creditors' committee.

Bruce Cordingley, Indianapolis, Inc., for Nat. Life Ins. Co.

**ENTRY ON COMPUTATION OF INDEBTEDNESS TO BE PAID TO NATIONAL LIFE INSURANCE COMPANY UPON PRIVATE SALE OF SECURITY BY DEBTOR**

ROBERT L. BAYT, Bankruptcy Judge.

This matter is before the court upon the Computation of Indebtedness filed by National Life Insurance Company ("National"). National has filed a brief in support thereof. In response thereto, plaintiff/debtor, LHD Realty Corporation, has filed a Brief Objecting to and Opposing Certain Claims of National Life Insurance Company. In response thereto, National has filed a Reply Brief. LHD has also filed a Calculation of Indebtedness Claimed by National Life Insurance Company. A hearing was held in this matter. The attorneys for the creditors' committee have been allowed to proceed on behalf of the debtor corporation.

The issues before the court are whether and to what extent National is entitled to late charges, prepayment charges, attorney fees and other expenses, as provided for in a Promissory Note under which LHD is liable to National, and whether LHD or National is responsible for the costs incurred by the sale of the property in question.

A brief recitation of the facts is necessary before the court discusses the relative merits of the parties' positions. On February 10, 1971, 1800, Inc., LHD's predecessor in interest, executed a Promissory Note and Mortgage in favor of Calumet Securities Corporation. The mortgage and note were subsequently assigned to National on May 10, 1971. On December 6, 1972, LHD assumed said mortgage and the indebtedness thereunder. The mortgage and note concern commercial property known as the 1800 Building. National is the holder of a first mortgage on the property. On June 13, 1980, LHD filed a Voluntary Petition Under Chapter 11 of the Bankruptcy Reform Act of 1978 ("Code"). On August 26, 1981, National filed a Complaint and Request for Relief from Stay, (Adv.Pro. No. 81–945) for the purpose of foreclosing on its mortgage or obtaining adequate protection. On November 20, 1981, a Purchase Agreement was executed by LHD and Robert Montgomery. According to the terms of that agreement, Montgomery would purchase the 1800 Building for the sum of $975,000.00 subject to his ability to "obtain a new first mortgage on acceptable terms and conditions within forty-five (45) days following acceptance of ... [the] Purchase Agreement." On December 8, 1981, LHD filed a Complaint to Sell the 1800 Building Free and Clear of Liens, Claims and Encumbrances, Except Current Leases. (Adv. Pro. No. 81–1428). As of this date the sale of the building has not been completed. The proceeds from the sale will be sufficient to pay the costs of the sale as well as the lien held by National.

The instant adversary proceeding is governed by 11 U.S.C. § 506(b) which provides:

"To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose."

*I. Late Charges.*

National seeks the payment of late charges for the period of July 1, 1980, through February 1, 1982. The amount of the late charge is $302.00 per month, totaling $6,040.00. The last regular mortgage payment made by LHD was for the month of April, 1981.

National makes its claim for late charges pursuant to a Promissory Note which provides in part:

"The holder of this note may collect a late charge not to exceed an amount equal to four per cent (4%) of the aggregate monthly instalment which is not paid within ten (10) days from the due date thereof, for the purpose of covering the extra expense involved in handling delinquent installments."

LHD opposes National's claim on the grounds that before National can collect the late charges it must show that they are permitted under both federal and state law; and late charges are penalties thereby making them non-allowable in the bankruptcy court.

■ As stated earlier, the controversy before the court is governed by § 506(b) of the Code, which allows reasonable fees and costs provided for in the agreement between the parties. While the court must initially look to § 506(b), the ultimate question of whether fees or costs—including late charges—are reasonable and allowable is a matter of state law. *In re Virginia Foundry*, 9 B.R. 493 (D.C.W.D.Va.1981).

■ It appearing that Indiana courts allow the collection of reasonable late charges pursuant to an agreement, *see Bowery Savings Bank v. Layman*, 142 Ind.App. 170, 233 N.E.2d 492 (1968), this court will allow all reasonable late charges claimed by National. The court believes that late charges for the period from July, 1980 to April, 1981—the last month for which LHD made a regular mortgage payment—are reasonable and should be allowed since by accepting late payments for those months National incurred the "extra expense involved in handling delinquent instalments." Promissory Note at ¶ 3. Since no later payments were made after April, 1981, National did not incur such expense. Therefore, any "late charges" for the months May, 1981 to the present would be in the nature of a penalty and not allowed in bankruptcy. Since the payments were not made at all, there should be no expense involved in handling the delinquent installments. Upon the sale of the property the delinquent payments will be made at one time. Such a payment will in effect eliminate any additional expenses of handling delinquent payments.

## II. Prepayment Premium.

National seeks an aggregate prepayment premium in the amount of $48,769.41. National claims this premium pursuant to a Promissory Note which provides in part:

"No prepayment of principal may be made during the first ten (10) loan years. After tenth (10th) loan year, the right is reserved upon sixty (60) days' prior notice in writing to prepay on any interest payment date all or any portion of the note principal by paying a premium on the amount prepaid as follows: During the eleventh (11th) loan year at five (5%) per cent, declining one (1%) per cent per year thereafter to a minimum of par.

In the event of prepayment in full only, and in addition to the foregoing, an additional prepayment premium will be payable in an amount computed as follows: The average "additional interest" payments for the three (3) preceding years capitalized at thirty-three and one-third (33⅓%) per cent."

LHD opposes the prepayment premium on two grounds, viz: (1) prepayment of the note by LHD is not voluntary thereby militating against its allowance; and (2) the prepayment premium is a penalty and as such is not allowable. Neither the facts controlling the instant matter nor applicable law lend support to LHD's contentions.

### A. Prepayment Is Not Voluntary.

As noted earlier, National filed a Complaint for Relief from Stay on August 26, 1981, for the purpose, *inter alia*, of foreclosing its mortgage on the 1800 Building or obtaining adequate protection. On December 8, 1981, LHD filed a Complaint to Sell the 1800 Building. Paragraph 15 of LHD's complaint states:

"The debtor in possession believes that due to the current negative cash flow; the apparently poor prospects of improving that cash flow in the near future; and the fact that the continued operation of the 1800 Building will require additional capital expenditures for repairs to the improvements, it would be in the best interests of the debtor and the creditors to sell the 1800 Building and to realize the equity that now exists in the 1800 Building."

The court notes that in its complaint LHD fails to mention National's Complaint for Relief from Stay.

Along with its Notice to Sell the 1800 Building, dated December 8, 1981, LHD sent a letter to all parties in interest explaining the then current situation and the reasons for wanting to sell the property. That letter stated in part:

"Due to the fact that we have been operating at fifty to sixty percent (50–60%) occupancy since November 1980, we were forced to cease making mortgage payments on the 1800 Building in May of 1981. In addition to the mortgage arrearages, we now have property taxes arrearages and the five-story parking garage is in need of major renovations that have been estimated at $150,000.00. Our leasing agent has informed us that he sees no new prospects for additional tenants in the 1800 Building and, because of the economy and the location of the 1800 Building, he does not believe that we will be obtaining any new rental prospects in the near future. For these reasons and at the request of the five noteholders who comprise the Creditors' Committee, we offered the 1800 Building for sale."

The court notes that in the letter LHD failed to state that National's Complaint for Relief from Stay was one of LHD's reasons for wanting to sell the property.

■ The lack of mentioning National's Complaint is important since National's Complaint for Relief from Stay is the event which LHD maintains forced or coerced it into selling the property. Given the above-quoted language from LHD's Complaint to Sell and LHD's Notice of Intent to Sell, the court concludes that LHD was not forced or coerced into selling the 1800 Building by any actions taken by National. Rather, LHD's act was voluntary since it had to sell given the unfortunate and disadvantageous economic situation it found itself to be in. LHD was motivated by a desire to do what was in the best interests of itself and of its creditors, not by the mere filing of a Complaint for Relief from Stay.

In support of its position LHD cites *Kilpatrick v. Germania Life Insurance Co.*, 183 N.Y. 163, 75 N.E. 1124 (Ct.App.1905); and *Landohio Corp. v. Northwestern Mutual Life Mortgage and Realty Investors*, 431 F.Supp. 475 (N.D.Ohio E.D.1976).

In *Kilpatrick*, the creditor instituted foreclosure proceedings against the debtor but subsequently dropped them. In response to the proceedings the debtor changed its position by acquiring a loan in order to pay off the debt. Because of this change in position the court did not allow the prepayment premium.

*Kilpatrick* clearly does not control the instant controversy. Unlike the case in *Kilpatrick*, National did not institute foreclosure proceedings nor did LHD change its position because of actions taken by National. LHD's decision to sell the property was based upon business considerations; payment of the prepayment premium, therefore, was voluntary and should be allowed. *See West Portland Development Company v. Ward Cook, Inc.*, 246 Or. 67, 424 P.2d 212 (1967).

In *Landohio*, a debtor sold his property to the sovereign under threat of eminent domain proceedings. Because of such threat the court held prepayment to be involuntary, thus disallowing any prepayment premium. *Landohio* is likewise inapplicable to the instant matter since the instant matter does not deal with threats by a sovereign of eminent domain proceedings—or threats of legal action by a creditor, for that matter—who is likely to succeed. The mere act of filing a Complaint for Relief from Stay by National does not guarantee success since the court could find that the creditor was adequately protected—which in fact this court did on December 18, 1981. *See* Adv. Pro. 81–945. Nor does such filing transform LHD's business decision to sell the 1800 Building into an involuntary act.

*B. Prepayment Premium Is A Penalty.*

In support of its position that a prepayment premium is a penalty LHD cites *In re Metz*, 1 B.R. 226 (Bkrtcy.W.D.Virg.1979). A close examination of *Metz*, and the cases

from which it draws support, reveals that *Metz* does not control the instant matter and also reveals that it does not support the broad proposition that a prepayment premium will always be a penalty.

In *Metz*, the issue before the court, *inter alia*, was whether late charges were allowable in a Chapter XI proceeding instituted pursuant to the Bankruptcy Act of 1898 ("Act"), not whether a prepayment premium should be allowed.

In reaching its decision that late charges are not allowed, *Metz* relied on Section 57(j) of the Act. That section disallowed a penalty assessed by the United States or other taxing entity for the non-payment of taxes. Since the instant matter was filed pursuant to the Code and is governed by Section 506(b), which section allows reasonable costs and charges, *Metz* is inapplicable.

After addressing the late charges issues, the court in *Metz* made reference to prepayment premiums and stated that they were also penalties, citing *In Re Hawks*, 471 F.2d 305 (4th Cir. 1973), and *In Re Tastyeast, Inc.*, 126 F.2d 879 (3rd Cir. 1941), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). A close examination of those cases reveals that they do not stand for the broad proposition that prepayment charges are penalties and therefore disallowed in bankruptcy.

 The allowance of a prepayment premium is governed by state law. *In re Virginia Foundry, supra.* LHD has not provided this court with nor has the court discovered Indiana cases which disallowed reasonable prepayment premiums. The instant prepayment premium is not a penalty nor is it contrary to state law; for these reasons the court finds that the prepayment premium claimed by National should be allowed.

That premium, however, should not be allowed to the extent claimed by National. Part of the prepayment premium amount is reached by applying a percentage to the amount prepaid, to-wit: five per cent (5%) during the eleventh (11th) year, four per cent (4%) during the twelfth (12th) year,

and so on. National calculated the prepayment premium using five per cent (5%). Given the date of the Promissory Note— February 10, 1971—and the fact that prepayment will occur in the twelfth (12th) year, National should have used four per cent (4%). The court finds, therefore, that an aggregate prepayment premium in the amount of $48,769.41 should be allowed. The court notes that said amount is considerably less than the interest National would have earned had LHD continued to make payments for the life of the Promissory Note.

## III. Attorney Fees.

National claims attorney fees pursuant to a Promissory Note which provides in part: "If default is made in the payment of this note and it is placed in the hands of an attorney for collection, or is collected through the ... Bankruptcy Court, the undersigned promise to pay, as attorney's fees, to the holder hereof, an additional amount of ten per of the principal and interest due thereon."

National claims attorney fees in the amount of $13,479.75—an amount well below ten per cent (10%) of the principal and interest due on the note. Said amount is based on hourly rates for services actually performed for National in the bankruptcy proceeding.

 LHD does not oppose the entire amount claimed but opposes those fees relating to services performed after November 20, 1981,—the date on which the Purchase Agreement between LHD and Robert Montgomery was executed. It is LHD's position that on that date National knew it was to be paid in full and therefore should have ceased all collection efforts. LHD further maintains that the fees requested by National should not be awarded since National did not provide detailed records supporting those fees. The court does not agree.

In support of its position that National should have ceased collection efforts on November 20, 1981, LHD cites *In re Oahu Cabinets, Ltd.*, 12 B.R. 160 (Bkrtcy.D. Ha-

waii 1981). In that case, the court held that once the debtor admitted default and promised to pay the entire amount due, the creditor need not continue collection efforts and will not be reimbursed for those efforts.

*Oahu* does not control the instant matter. *Oahu* applies to a situation in which a creditor, because of actions or representations of the debtor, is reasonably certain that the creditor will receive payment in full without any further action by the debtor. Such is not the case in the instant matter. It cannot be said that the Purchase Agreement between LHD and Robert Montgomery automatically guaranteed payment in full to National and put National on notice that it would receive such payment without any other action on its part. In fact, the court was not reasonably certain on November 20, 1981, that the sale of the 1800 Building would definitely occur.

The Purchase Agreement contained a condition that the purchaser would buy the property if the purchaser could "obtain a new first mortgage on acceptable terms and conditions within forty-five (45) days following acceptance of this Purchase Agreement." At hearings held subsequent to November 21, 1981, the purchaser had not yet acquired financing, thus casting doubts as to whether the sale of the property would occur. Given such uncertainty, it was incumbent upon counsel for National to take reasonable steps to protect the interests of its client. The actions taken by National's counsel were reasonable in light of the circumstances and the court therefore finds that National's claim for attorney fees should be allowed.

■ While the court agrees that attorney fees must be supported by detailed documentation, *see In re Meade Land and Development Co., Inc.,* 577 F.2d 858 (3rd Cir. 1978) and 527 F.2d 280 (3rd Cir. 1975) *H. P. Tool Manufacturing Corp.,* 7 B.C.D. 1312, 12 B.R. 600 (Bkrtcy.E.D.Pa.1981), it does not agree that National failed to do so. An examination of the documentation supplied by National reveals that said documentation is sufficient to support National's claim for attorney fees.

*IV. Other Charges.*

■ As other charges, National claims the amount of $3,055.60 paid to Paul I. Cripe, Inc., for inspection of the 1800 Building, and $2,292.50 for expenses relating to trips made by National to inspect the 1800 Building during the default period. National claims these expenses pursuant to paragraph 9 of the Mortgage which provides in part that the "Mortgagor will, on demand, reimburse Mortgagee for any expense . . . incurred in connection with any suit or proceedings to which the Mortgagee may be made a party by reason of this mortgage . . . ." A bankruptcy proceeding clearly falls within the ambit of "any suit or proceeding."

■ LHD opposes the claim relating to Paul I. Cripe, Inc., on the ground that it is not clear whether Cripe was employed by National or by both National and Montgomery, the prospective purchaser, when the inspection was made. The court finds that at the time of the inspection Paul I. Cripe was employed by National and was providing services solely at the request of and for National. The court also finds that the amount claimed by National is reasonable and should therefore be allowed.

■ LHD opposes the claim relating to the inspection trips made by National on the grounds that the expenses for such trips were not reasonable in that the inspections were not necessary for the collection of the debt; were not predicated by LHD's default; or were not important to National's collection efforts. The court agrees in part.

Two trips were made by Donald M. Hoffman, Construction Manager, and James D. Means, Supervisor of Property Management. The court believes that said trips were made as a direct result of the Chapter 11 Petition filed by LHD. In assessing the value and condition of its security it was prudent for National to make an inspection trip. The court, however, does not believe that both trips were necessary. Accordingly, the court finds that one-half (½) of the

aggregate expenses incurred by National in its inspection of the 1800 Building should be allowed; that amount is $1,146.25.

## V. Expenses Relating To The Sale Of The 1800 Building.

The Code provides that a trustee—or debtor, as the case may be—may recover the reasonable costs and expenses of the sale of property securing an allowed secured claim. See 11 U.S.C. 506(c). The instant case is not, however, one to which § 506(c) applies.

 As already noted, LHD made a voluntary business decision to sell the 1800 Building. The proceeds from the sale will be sufficient to satisfy National's lien and the costs of the sale. National, being fully secured, would realize its claim in full if it were allowed to foreclose its mortgage. In addition, National would be able to recover the costs of foreclosure. For these reasons, the court finds that the costs and expenses from the sale of the 1800 Building may not be recovered from National. See In re Burnette, 8 B.C.D. 255, 14 B.R. 795 (Bkrtcy.E.D. Tenn.1981).

The foregoing represents findings of fact and conclusions of law as required by Bankruptcy Rule 752.

It is therefore ORDERED, ADJUDGED AND DECREED that:

1. The following claims by National are ALLOWED:

| | | |
|---|---|---|
| A. | Principal due as of 4/1/81 | $563,654.72 |
| B. | Late charge of $302 per month for months of 7/1/80 through 4/30/81 | $ 3,020.00 |
| C. | Accrued interest on principal at 10⅛% interest for months of 5/1/81 through 2/28/82 | $ 47,558.37 |
| D. | Additional interest for months of 6/1/81 through 2/1/82 based on 3% of gross rentals from preceding month | $ 6,041.19 |
| E. | Shortage in 1980 remittance of 3% of gross receipts | $ 142.23 |
| F. | Prepayment premium in 12th year at 4% of principal | $ 22,546.19 |
| G. | Additional prepayment premium for payment in full | $ 27,505.86 |
| H. | Costs, expenses and fees incurred by National | |
| | (i) Attorney fees through 3/15/82 | $13,479.75 |
| | (ii) Paul I. Cripe, Inc. | $ 3,055.60 |
| | (iii) Inspection Trips | $ 1,146.25 |
| | Total costs, expenses and fees | $ 17,681.60 |
| I. | Less $744.50 in escrow account | $ 744.50 (−) |
| | Total allowance due National | $687,405.66 |

2. The costs and expenses from the sale of the 1800 Building may not be recovered from National but shall be borne by the debtor, LHD.