**In re Peter J. WHITE a/k/a Pufferbellies and Jeanne Marie White, Debtors.**

**Bankruptcy No. 87–10548–JNG.**

United States Bankruptcy Court, D. Massachusetts (Boston).

July 1, 1988.

Jon D. Schneider, Goodwin, Procter & Hoar, Boston, Mass., for creditor-Wedgestone Realty Investors Trust.

Christopher W. Parker, Hinckley Allen Tobin & Silverstein, Boston, Mass., for debtors.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

## I.  INTRODUCTION

Wedgestone Realty Investors Trust ("Wedgestone") has filed a claim against the Debtors based upon a loan made in June of 1986 secured by four properties owned by the Debtors individually or as trustees of real estate trusts. Wedgestone's claim, as of January 1, 1988, totals $4,032,011.03. It consists of the remaining loan balance of $2,460,000, insurance premiums of $14,052.08, appraisal fees of $8,000, interest in the amount of $1,511,-184.48 and attorneys' fees of $38,774.47. Substantially all the interest is due to the application of a default rate of 4% per month per annum since October 1, 1986. Wedgestone maintains that since January 1, 1988 interest at the default rate accrues at the rate of approximately $3,360 per day. The Debtors and the Creditors' Committee object to the allowability of a portion of Wedgestone's claim.[1]

## II.  FACTS

The undisputed facts with respect to Wedgestone's claim are succinctly set forth in the joint pre-trial memorandum submitted to the Court by the Debtors and Wedgestone. Except for a few additional details and editorial changes, the Court will use the statement of facts adopted by the parties in their joint pre-trial memorandum.

On or about June 18, 1986, Peter J. White ("White") sought a loan from Wedgestone in the amount of $2,650,000. The purpose of the loan was to enable White to acquire a nightclub known as "Pufferbellies" and certain associated real and personal property located in Hyannis, Massachusetts. At that time, White, a sophisticated businessman, was operating, individually or through corporations he controlled, two other restaurants, namely "Vanderbilts" in Methuen, Massachusetts and "Pufferbellies" in Newton, Massachusetts. White proposed to secure the loan from Wedgestone with a mortgage on the Hyannis real property that would be subordinate to a $1,200,000 mortgage in favor of the sellers and with mortgages on three other parcels of real property in Newton, Massachusetts that he owned or controlled through realty trusts. Specifically, White proposed to grant Wedgestone a second lien on a commercial building on Needham Street, a first lien on a three family investment property on River Street and a first lien on the Debtors' residence and two adjacent lots on Wykeham road.

Less than one week later, Wedgestone, on or about June 22, 1986, issued a commitment letter with respect to the requested loan. The commitment letter indicated that interest would accrue on the principal amount of the loan at the prime rate plus 6% per annum (but not less than 14.5% per annum) prior to a default and at the rate of 4% per month after a default. In either case, interest would be payable on the first day of each month.

---

1. As the parties note in their joint pre-trial memorandum, Wedgestone actually filed two claims. One is based on the note signed by Peter J. White to evidence the loan and the other is based on the guaranty of the note by the Debtors in their capacities as trustees of certain realty trusts. The two claims can be treated as one for the purposes of the objections by the Debtors and the Committee.

At the loan closing, Wedgestone declined to make the loan on the terms set forth in the commitment letter. Wedgestone asserted that White had failed to deliver the following documents required by the commitment letter:

(a) discharges of second and third mortgages and an attachment on the Needham Street property and subordinations of two rights of first refusal with respect to the property;

(b) a life insurance policy covering White's life and a pledge of the policy to Wedgestone;

(d) the consent of the Commonwealth of Massachusetts to the assignment of a parking lease relating to the Hyannis property;

(e) copies of the liquor licenses for the restaurants operated by White at the Hyannis and Needham Street properties;

(f) evidence of general liability and liquor liability policies covering certain of the collateral and of endorsements entitling Wedgestone to notice of cancellation of certain policies;

(g) title insurance policies for the Newton properties and mortgage plot plans and municipal lien certificates for all properties.

White disputed Wedgestone's contentions, believing that any alleged failure on his part to deliver documents was not the true reason why Wedgestone declined to make the loan on the terms set forth in the commitment letter. Nevertheless, White, who was represented by an attorney at the closing, and Wedgestone agreed to modify various terms of the loan from those specified in the commitment letter as follows:

(a) an increase in the pre-default rate of interest on the loan from prime plus 6% (but not less than 14.5%) to prime plus 8% (but not less than 16.5%);

(b) an increase in loan points from six to eight;

(c) a principal prepayment of $300,000. The parties did not alter the default rate of interest.

On June 26, 1986, in accordance with the modifications just identified, Wedgestone loaned White $2,710,000. A note executed by White and secured by various mortgages and security agreements evidenced the loan.

The note executed by White contains the default rate of interest provision at issue here. The provision provides:

In the event of (i) a default continuing uncured for five (5) days in making any payment of interest due hereunder, or (ii) default in making any payment of principal or other charges due hereunder, then during the period of any delinquency, which shall relate back to the date of original default, and after maturity (which shall mean the date stated above on which the entire balance of principal and interest is due and payable hereunder, or such earlier date on which the entire sum may become due and payable at the option of the holder following default as set forth above) this Note shall bear interest at the rate of four percent (4%) per month from the date such payment was due or from maturity, as the case may be.

The promissory note dated June 26, 1986 also contains the following late charge provision:

In the event any payment required hereunder is not paide [sic] within five (5) days of the date such payment is due the holder may, at its option, charge a late charge in the amount of five (5%) of such overdue payment.

Wedgestone duly perfected its mortgages and security agreements covering the real property and related personal property owned by White or by the realty trusts he controlled. White and his wife as trustees of the realty trusts also guaranteed the note.

The note provided that Wedgestone was entitled to recover from the Debtors its costs and expenses, including all reasonable attorneys' fees, in connection with the documentation of the loan, the collection of the note and the enforcement of its rights under the note or agreements securing the loan. The mortgages securing the loan also provided that Wedgestone could pay the premiums for insurance with respect to

its collateral to the extent such insurance was required under the mortgages and then could add the amount of the premiums to the indebtedness secured by the mortgages.

Consistent with the final terms of the loan, the note required a prepayment of principal in the amount of $300,000. That amount was to be paid in two installments of $150,000 each on August 1, 1986 and September 1, 1986. At White's request, Wedgestone orally agreed to change the number of required installments. Wedgestone contends that the oral agreement contemplated three payments of $100,000 each on August 1st, September 1st, and October 1, 1986. The Debtors contend that the amount of the payment required to be made on October 1, 1986 was only $50,000. The Court heard evidence relative to this issue, which is the only serious factual issue in dispute. The issue is important because its resolution will govern when the Debtors defaulted under the note.

White made three principal prepayments on the note as follows: $100,000 on August 4, 1986, $100,000 on August 29, 1986, and $50,000 on October 6, 1986. On October 21st and 29th and on November 3, 1986, Wedgestone notified White in writing that it considered him to be in default on the note for having paid only $250,000 of the $300,000 in principal prepayments required by the terms of the note. On October 17th and November 17, 1986, Wedgestone sent interest payment notices to White notifying him that the principal balance of the loan was $2,460,000 and that the amount of interest due was $32,517.08 on November 1, 1986 and $99,044.58 on December 1, 1986. On November 30, 1986, John J. Heaney, treasurer of Wedgestone, sent a letter to White requesting that White confirm to Wedgestone's auditors that the principal balance of the loan was $2,460,000 and that interest was paid to November 30, 1986.

On November 19, 1986, Wedgestone purported to accelerate the maturity of the note based on White's failure to make the $50,000 principal payment. It demanded payment of the accelerated principal and accrued interest. White failed to pay the amounts demanded. However, the Debtors maintain that they were not in default until after January 26, 1987.

On December 4, 1986 and January 30th and February 3, 1987, Wedgestone again notified White that he was in default and that, accordingly, interest at the default rate was accruing. Again, the Debtors maintain that they were not in default until after January 26, 1987. Wedgestone received payments on account of the note after White's alleged default in the following amounts: $35,000 on October 6, 1986, $33,000 on November 7, 1986, $33,000 on December 9, 1986 and $32,000 on February 3, 1987. The Debtors maintain that such payments were mailed earlier than the dates indicated. Wedgestone maintains that the payments were all slightly less than the accrued interest due at the pre-default rate. White otherwise failed to make any payments to Wedgestone through March, 1987.

On March 31, 1987, Wedgestone notified the Debtors of the commencement of foreclosure proceedings on account of the continuing default. Two weeks later, on April 13, 1987, the Debtors filed the Chapter 11 petition for relief that initiated this case.

Pursuant to the note and mortgages and in addition to principal, interest and late charges, Wedgestone is seeking reimbursement for attorneys' fees, insurance and appraisal payments. Wedgestone has paid the law firm of Goodwin, Procter & Hoar $38,774.47 for services from September 1, 1986 through July 31, 1987 and $34,160.73 for services through November 30, 1987, relating to documentation of the loan, collection of the note and enforcement of Wedgestone's rights under the mortgages securing the note. The Court will consider the reasonableness of the attorneys' fees and their allowance at another time.

Wedgestone received notices, dated December 28, 1986, February 2, 1987, and April 20, 1987, that certain insurance policies obtained by White covering the collateral for its loan would be terminated for nonpayment of premiums. By checks dated January 12, March 13, and May 4, 1987, Wedgestone paid a total of $14,052.08 in

premiums to maintain the insurance in effect. The Debtors in their post-trial memorandum admit that Wedgestone is entitled to be reimbursed for those sums.

In connection with its Motion for Relief from Stay filed in this case on August 14, 1987, Wedgestone retained Robert F. Shannon, a real estate appraiser, to prepare a valuation of the Debtors' properties. Between September 1, 1987 and October 31, 1987, Wedgestone paid Mr. Shannon a total of $8,000 in fees for his services. The Debtors do not contest inclusion of this sum in Wedgestone's proof of claim.

The Debtors' schedules in this case reflect that the value of their assets is $13,-898,010.00 and that the amount of the secured and unsecured claims against them is $6,354,610.00. In an application for financing filed with this Court, the Debtors state that the total value of their assets is sufficient to satisfy all secured and unsecured claims.

Wedgestone has given the notification to the attorney general required by the Massachusetts usury statute, Mass.Gen.Laws, ch. 271, § 49, and has otherwise complied with that statute.

### III. DISCUSSION

With respect to the timing of the Debtors' default, the Court notes that Wedgestone, in its post-trial memorandum, has abandoned the argument that there was an interest default on October 1, 1986. Wedgestone, nevertheless, insists that a default occurred on October 1st for nonpayment of principal.

The evidence introduced at the March 3, 1988 hearing established that, on the day after the June 26, 1986 loan closing, White requested a $50,000 reduction in the amount of principal prepayments from $300,000 to $250,000 in a telephone conversation with John McGovern ("McGovern"), the Executive Vice-President of Wedgestone and the chief lending officer of the trust. White testified that in response to his request McGovern stated: "I'm sure we can work it out."

McGovern testified that he remembered a specific agreement to extend the period for principal prepayments but that he could not recall a conversation with White concerning a reduction in the amount of principal prepayments. Additionally, he indicated that, in any event, he lacked the authority to reduce the prepayment amount.

McGovern's testimony was corroborated by a letter dated July 10, 1986 from Jo-Ann M. Marzullo, Esq., indicating that

The Note specifies that there are two mandatory principal payments of $150,-000 each on August 1, 1986, and on September 1, 1986. Peter Conley agreed with the Borrower after the Note was executed to instead require three principal payments of $100,000 each on August 1, 1986, September 1, 1986, and October 1, 1986.

This letter makes no mention of any reduction in the amount of the principal prepayments, although White's testimony was that the alleged agreement preceded the date of the letter. McGovern's testimony also was consistent with the explanation he gave White as to the reasons for the required $300,000 principal prepayment, namely that "$300,000 additional exposure was taken on 1) by not discharging the $254,000 mortgage and 2) increasing the original loan amount $2,650,000—$2,710,-000." McGovern's handwritten explanation was delivered to White along with a formal notification, dated October 21, 1986, that $50,000 in principal reduction was due and that the note would be considered in default if Wedgestone did not receive payment by October 23, 1986.

The Court is compelled to agree with Wedgestone that the preponderance of the evidence established that the Debtors defaulted on the note with respect to the payment of principal on October 1, 1986 when White paid $50,000 instead of $100,-000 toward the prepayment of principal. The Court was impressed with White's testimony and acknowledges that he may have at least initially misunderstood McGovern's intention and ability to assist him in getting the total principal prepayment reduced by

$50,000. Nevertheless, the Court finds that, unlike the situation with respect to the timing of the payments, Wedgestone made no enforceable commitment to White to reduce the amount of the principal prepayment. Moreover, Wedgestone informed White that this was the case on October 21, 1986.

## A. THE DEBTORS' POSITION

The Debtors contend that the provision in the June 26, 1986 note providing for interest at the rate of 4% per month on the outstanding principal balance of the loan is unreasonable, unconscionable and unenforceable as a penalty. In the Debtors' view, the 4% provision has no relation to their performance or default under the note and was inserted merely to secure their performance. In short, they maintain that the provision is neither a reasonable liquidated damages provision nor a valid estimate of damages sustained by Wedgestone due to their default. Accordingly the Debtors conclude that Wedgestone is entitled only to compensation for the use of its money at the contract rate of 16.5%.

The Debtors principally rely on two cases: *In re Tastyeast, Inc.*, 126 F.2d 879 (3d Cir.), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942); and *In re Rolfe*, 25 B.R. 89 (Bankr.D.Mass.1982), *aff'd*, 710 F.2d 1 (1st Cir.1983). On the basis of the *Rolfe* case and authorities cited in it, the Debtors assert that the invalidity of claims based upon "default interest" clauses is settled in this district.

In *In re Tastyeast*, 126 F.2d 879 (3d Cir.1942), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942), the United States Court of Appeals for the Third Circuit considered the debtor's appeal from an adverse order on the amount of interest to be paid a mortgagee. The court described the terms of the note at issue and the debtor's financial condition as follows:

> The note ... for the sum of $33,600 was to run for six months with prepaid interest of $3,600 or at an interest rate slightly in excess of 21% per annum. Upon failure to pay at maturity, the interest rate was to be increased to 30% per year.

> We can guess at the debtor's financial status from the amount of the interest it was forced to pay. As might have been expected, three months after negotiating the loan, the debtor filed a petition for reorganization under Chapter X of the Bankruptcy Act.

126 F.2d at 880 (footnote omitted). Under the debtor's plan of reorganization, the creditor was paid the principal balance of its claim and interest at six per cent per year, rather than interest at the contract rate of 30% per year. The amount of interest in dispute was deposited with the District Court. The District Court judge adopted the referee's recommendation that the disputed interest should be paid. The debtor appealed, arguing *inter alia* that the creditor's claim was a penalty that the bankruptcy court, as court of equity, should not enforce. The Third Circuit agreed with the debtor, stating:

> ... even though the increased rate is not usurious it nevertheless constitutes a penalty. The increase in the interest rate may be justified as a liquidated damage provision only if the amount stipulated is proportionate 'to any damage reasonably to be anticipated in the circumstances.' We fail to find any direct relation between the increased rate and the anticipated loss which a default might have caused the mortgagee. Rather it seems to us that the mortgagee definitely intended to enforce a penalty upon the debtor.... As we view the transaction, both parties knew the increase was intended only to coerce the debtor into a prompt payment upon maturity. As such it was an agreement for a penalty and unenforceable in bankruptcy.

126 F.2d at 882 (footnote omitted).

This Court notes that the *Tastyeast* case was decided under the Bankruptcy Act. The Act "recognized the right of a secured creditor to pay itself from its security, and provided a means whereby and described the extent to which the secured creditor, if it chose to do so, could participate in distributions from the estate." 3 *Collier on Bankruptcy* ¶ 506.02 at 506–3 (15th ed.

1988). The Act, however, had no express provisions relating to the allowance of post-petition interest, fees, costs and charges to secured creditors. *Id.* at 506–5. Section 506(b) of the Bankruptcy Code codifies case law under the 1898 Act. It provides in relevant part:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (West 1988). With respect to this somewhat ambiguous provision, one commentator has stated: "[n]ot withstanding the misplaced comma or commas, post-petition interest should be computed at the rate provided in the agreement under which the claim arose, the so-called 'contract rate' of interest. The great majority of courts which have considered the issue have utilized the contract rate, and this result appears consistent with prior case law." 3 *Collier on Bankruptcy* ¶ 506.04 at 506–43–44.

In *In re Rolfe*, 25 B.R. 89 (Bankr.D. Mass.1982), *aff'd*, 710 F.2d 1 (1st Cir.1983), the bankruptcy court considered an objection by Chapter 13 debtors to the validity of a promissory note providing for interest at the rate of 10% compounded monthly on arrearages. The debtors claimed the note was usurious under Massachusetts law. The claimant denied the note was usurious but conceded that the requisite filing with the attorney general pursuant to Mass. Gen.Laws ch. 271, § 49 had not been made. Noting that the effective rate of interest would eventually exceed 20%, the maximum allowed by the Massachusetts legislature without notice to the attorney general, the bankruptcy court disallowed the additional interest at the 1% per month rate. Judge Lavien stated:

> I find the arrearage provision after default when no further payments are made unrelated to any added cost that might occur with late or partial payment. The arrearage charge after March 1978 is therefore void as an uncollectible penalty. *In re LHD Corporation* 20 B.R. 722, 725 (Bkrtcy.S.D.Ind 1982)....

> \* \* \* \* \* \*

> I find that the arrearage provision is in the nature of a penalty and unreasonably disproportionate to the real damages from the breach and is void and unenforceable. *Begelfer v. Najarian,* 381 Mass. 177 [409 N.E.2d 167] (1980); *A–Z Servicenter, Inc. v. Segall,* 334 Mass. 672 [138 N.E.2d 266] (1956).

25 B.R. at 94. Parthenthetically, this Court observes that the outcome of the *Rolfe* case was predicated in part on the judge's finding that the creditor was improperly charging interest on interest, which is not the case in the instant proceeding. 25 B.R. at 94. Additionally, the debtor in *Rolfe* was insolvent.

At least in their memorandum, the Debtors also rely upon *In re LHD Realty Corp.*, 20 B.R. 722 (Bankr.S.D.Ind.1982), *aff'd*, 726 F.2d 327 (7th Cir.1984), a case cited by the court in *In re Rolfe*, for the proposition that any late charges, as opposed to default interest charges, must be limited to the expenses incurred by the lender in handling a late payment. The Debtors in their trial memorandum seem to suggest that late charges are inappropriate when no payments at all are made. The Court notes that the Debtors drop their opposition to the late charge provision in their post-trial memorandum, focusing instead exclusively on the default interest provision in the note given by the Debtors to Wedgestone.

In *LHD Realty*, the Indiana court indicated that a reasonable late charge (i.e., 4% of each monthly installment) would be allowed as a kind of handling charge for late payments that were actually made. Since no late payments were made by the debtor in that case after April 1981, no expenses were incurred by the secured party. Accordingly, the court reasoned that any late charges after that time were in the nature of a penalty. *In re LHD Realty Corp.*, 20 B.R. at 725. The Court observes that a contract provision in the *LHD Realty* case expressly stated that the creditor

could collect late charges " 'for the purpose of covering the expenses involved in handling delinquent installments.' " 20 B.R. at 724. No such limiting provision is involved in the instant case either with respect to Wedgestone's claim or that of Bank Five for Savings, another secured party involved in this proceeding. Moreover, section 506(b) expressly permits reasonable charges to oversecured creditors, and courts routinely allow such charges. *See, e.g., Mack Financial Corp. v. Ireson,* 789 F.2d 1083 (4th Cir.1986), *affirming* 53 B.R. 118 (W.D.Va.1985) (a 5% late charge is reasonable and allowed); *In re LHD Realty Corp.,* 726 F.2d 327 (7th Cir.1984) (a 4% late charge is allowed as reasonable); *In re Neusteter Realty Co.,* 79 B.R. 30 (D.Colo. 1987) (allowing a 4% late charge as reasonable); *In re Dalessio,* 74 B.R. 721 (9th Cir.BAP 1987) (a 10% late charge was allowed); *In re Ward,* 73 B.R. 119 (Bankr.N.D.Ga.1987) (4% late charge on prepetition arrearages allowed); *In re Lejeune,* 73 B.R. 98 (Bankr.N.D.Ga.1987) (10% late charge allowed); *In re Tavern Motor Inn, Inc.,* 69 B.R. 138 (Bankr.D.Vt.1986) (4% late charge totalling $26,393.01 allowed prior to acceleration of the note in question); *In re Richardson,* 63 B.R. 112 (Bankr.W.D. Va.1986) (4% late charge allowed as reasonable). Accordingly, this Court will allow Wedgestone's claim, if any, for late charges on overdue monthly installments up until the time the amount due under the note was accelerated. *In re Tavern Motor Inn, Inc.,* 69 B.R. 138 (Bank.D.Vt.1986).

The context in which the allowability of post-petition interest, fees, costs and charges is determined may be important as section 506(b) is sometimes improperly applied to determine the appropriate post-confirmation rate of interest. *See In re Marx,* 11 B.R. 819, 820–21 (Bankr.S.D.Ohio 1981); *In re Minguey,* 10 B.R. 806 (Bankr.W.D. Wis.1981); 3 *Collier on Bankruptcy* ¶ 506.04 at 506–44. This deficiency does not appear to undercut the case relied upon by the Debtors. In *In re Tastyeast, Inc.,* 126 F.2d 879 (3d Cir.), *cert. denied,* 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942), the issue of the allowability of the contract rate of interest arose under a reorganization plan that called for the immediate satisfaction of the mortgagee's claim. In *In re Rolfe,* 25 B.R. 89 (Bankr.D.Mass. 1982), *aff'd,* 710 F.2d 1 (1983), the debtors objection to the creditor's claim for "penalty" interest preceded the formulation of a Chapter 13 plan.

The Debtors, in urging the Court to utilize a liquidated damages analysis to decide whether the June 26, 1986 contract calls for payment of legitimate liquidated damages or merely exacts a penalty, suggest that Wedgestone had the burden of introducing evidence of its damages that could not be compensated for by the allowance of the nondefault rate of interest, i.e., 16.5%. Citing dicta in *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167 (1980), the Debtors assert that a liquidated damages analysis is appropriate even where the secured creditor has made the requisite filing with the attorney general. The applicable Massachusetts law to be applied, in their view, is set forth in *A–Z Servicenter, Inc. v. Segall,* 334 Mass. 672, 138 N.E.2d 266 (1956). In that case, the Supreme Judicial Court stated:

Whether a provision of a contract for the payment of a sum upon a breach is rendered unenforceable by reason of its being a penalty depends upon the circumstances of each case. *DeCordova v. Weeks,* 246 Mass. 100 [140 N.E. 269 (1923)]. *International Paper Co. v. Priscilla Co.* 281 Mass. 22 [183 N.E. 58 (1932)]. Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced. *Garst v. Harris,* 177 Mass. 72 [58 N.E. 174 (1900)]. *Putnam Machine Co. v. Mustakangas,* 236 Mass. 376 [128 N.E. 629 (1920)]. But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages. *Schute v. Taylor* [46 Mass.], 5

Met. 61. *Makletzova v. Diaghileff,* 227 Mass. 100 [116 N.E. 231 (1917)]. *See Fisk v. Gray,* [93 Mass.] 11 Allen, 132. The words 'liquidated damages and not as a penalty' in the instant note are not decisive. If from the nature of the transaction and the attending circumstances it appears that the contract is a cloak to hide a sum of money out of proportion to and differing greatly from the actual damages ordinarily arising from a breach, then the sum named as in the case at bar is a penalty. This is true even if it may be designated in the contract as liquidated damages. *Shute v. Taylor* [46 Mass.], 5 Met. 61. *Commissioner of Insurance v. Massachusetts Accident Co.* 310 Mass. 769, 771 [39 N.E. 2d 759 (1942)]. *Kothe v. R.C. Taylor Trust,* 280 U.S. 224 [50 S.Ct. 142, 74 L.Ed. 382 (1930)].

*Id.* at 675, 138 N.E.2d 266. *See also, In re D. Federico Co.,* 25 B.R. 822 (Bankr.D. Mass.1982), *aff'd,* 723 F.2d 122 (1st Cir. 1983).

Finally, the Debtors criticize *In re W.S. Sheppley & Co.,* 62 B.R. 271 (Bankr.N.D. Iowa 1986), and *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987). In view of the importance of these two cases to Wedgestone's position, the Court will review them in the context of Wedgestone's argument.

### B. WEDGESTONE'S POSITION

Wedgestone's position is multifaceted. While recognizing the possibility that the Court might not allow the default rate of interest in full, it argues that the default rate of interest is governed by and enforceable under Massachusetts law; that the default rate of interest is not a penalty; and that there is no basis for disallowing the default rate of interest on equitable grounds.

Wedgestone insists that under Massachusetts law the only precondition for the imposition of an interest rate in excess of 20% is notification of the attorney general. It correctly distinguishes the cases cited by the Debtors as involving lenders who failed to make the proper filing under Mass.Gen.

Laws ch. 271, § 49. Moreover, Wedgestone cites three cases in which courts have upheld default rates against their attack as penalties, namely *Ruskin v. Griffiths,* 269 F.2d 827 (2d Cir.1959), *cert. denied,* 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960); *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C. D.Cal.1987); and *In re Berry Estates, Inc.,* 34 B.R. 612 (Bankr.S.D.N.Y.1983).

The *Ruskin* case involved a petition filed by a trustee, Ruskin, under a collateral agreement seeking a determination of his claim on unpaid notes, principal and interest, and the amount of his lien for his own and his attorney's compensation. Ruskin, according to the court, claimed unpaid accrued interest at the rate of 4% until the date the amount due under the notes was accelerated and 6% thereafter. The district court, relying on *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), held that Ruskin was not entitled to the variable interest set forth in the contract. The Court of Appeals for the Second Circuit reversed.

At this juncture, it is important to take note of the Supreme Court's holding in *Vanston,* a case involving an insolvent debtor. In that case, the Supreme Court denied an indenture trustee's claim for interest on interest. As articulated by the Second Circuit, the Supreme Court's holding was

> that since the district court had taken over the debtor's assets for the purpose of preserving and protecting them 'pending a ratable distribution among all the creditors according to their interests as of the date the receivership began,' it would have been contrary to that purpose and inequitable to the junior creditors to have junior creditors suffer and the mortgage bondholders enriched because of a stay order required to further the receivership aim.

*Ruskin* 269 F.2d at 830–31 (citation omitted).

In reversing the district court's decision to deny Ruskin the benefit of the variable interest contract, the Second Circuit took note of the Supreme Court's opinion in

*Vanston* that "[it] is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balancing of equities between creditor and creditor or between creditors and the debtor." *Vanston,* 329 U.S. at 165, 67 S.Ct. at 241. However, the Second Circuit ultimately was guided by the Supreme Court's determination that its holding did not apply to contests between a creditor and stockholders of the debtor. In the words of the Supreme Court, "where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than the debtor." 329 U.S. at 164, 67 S.Ct. at 241. The Second Circuit bluntly interpreted this language to mean that "the [Supreme] Court could hardly have meant that the rule it was declaring was to be applied in the case of a solvent debtor." *Ruskin,* 269 F.2d at 831. Accordingly, the circuit court found:

A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable. It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to the debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

Undoubtedly the debtor filed its petition under Chapter XI because it believed it beneficial to itself to do so, and in a case such as this, where there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.

*Ruskin,* 269 F.2d at 832 (citations omitted).

It is of interest to this Court that the *Ruskin* court in reaching its decision cited a Massachusetts case with approval. *In re International Hydro–Electric System,* 101 F.Supp. 222 (D.Mass.1951). In the *Hydro–Electric System* case the district court stated:

"[I]t is important that IHES is not at the present time insolvent. It has assets more than sufficient to meet all claims of its creditors. No benefit will be given to the debenture holders at the expense of any other class of creditors. The burden of this payment will fall entirely on the interest of the stockholders. They cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture. The situation here differs from that in Vanston Bondholders Protective Committee v. Green * * * where the payment of interest on deferred interest payments was not allowed even though called for by the trust indenture, because the payment would have reduced the share of subordinate creditors in the reorganization of an insolvent corporation."

101 F.Supp. at 224. Moreover, both the *Ruskin* and *Hydro–Electric System* cases have been cited with approval by the United States Court of Appeals for the First Circuit in *Debentureholders Protective Committee of Continental Investment Corp. v. Continental Investment Corp.,* 679 F.2d 264 (1st Cir.), *cert. denied,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). In that case, the circuit court stated:

Where the debtor is *solvent,* the bankruptcy rule is that where there is a *contractual* provision, valid under state law, providing for interest on unpaid instalments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments due before and instalments due after the petition was filed. *Ruskin v. Griffiths,* 269 F.2d 827, 830–32 (2nd Cir.1959), *cert. den.* 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960); *In re Hydro–Electric Sys-*

*tem, supra,* 224. This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use money to *his* advantage. Moreover, the rule does not in any way affect any creditor other than the claimant of interest on interest. Finally, the rule is in harmony with the settled English and and American law that when an alleged bankrupt is proved solvent, the creditors are entitled to receive post-petition interest before any surplus reverts to the debtor. *New York v. Saper,* 336 U.S. 328, 330 n. 7, 69 S.Ct. 554, 555 n. 7, 93 L.Ed. 710 (1949); *United States v. Bass,* 271 F.2d 129, 130 (9th Cir.1959); *Littleton v. Kincaid,* 179 F.2d 848, 27 A.L.R.2d 572 (4th Cir.1950).

*Id.* at 269 (emphasis in original).

In the next case relied upon by Wedgestone, *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987), an insolvent debtor objected to a claim by the Travelers Insurance Company for interest after the debtor's post-petition default at the contractual default rate of 14.75%, instead of the nondefault contractual rate of 10.75%. The objection raised an issue crucial to the court's determination of how much could be paid to junior lienholders and administrative claimants and whether a plan could be confirmed.

Like the Debtors in this case, the debtor in *Skyler Ridge* relied upon *In re W.S. Sheppley & Co.,* 62 B.R. 271 (Bankr.N.D. Iowa 1986). In the *Sheppley* case, Judge Yacos, sitting by designation, considered a secured creditor's claim for a default rate of interest of 12% in place of the pre-default rate of 9.27%. He held that "a bankruptcy court presented with a § 506(b) motion is not *required* in all cases to apply a contractual default rate of interest in determining the amount of an " 'allowed secured claim.' " Emphasizing flexibility and the balancing of equities approach set forth in the *Vanston* case, Judge Yacos refused to allow the application of the default rate of interest based upon an analysis of five factors: 1) little risk of nonpayment either before or during the bankruptcy case; 2) lack of evidence that the contract rate of 9.27% was not a prevailing market rate at the time of default; 3) no increased risk to the lender following default because of an impending plan proposing a quick and orderly liquidation and full payment of the secured creditor; 4) little likelihood that equity interests would receive a distribution under the plan; and 5) the partial responsibility of the lender for delaying confirmation. *Sheppley,* 62 B.R. at 278–79. With respect to the fourth factor, the court observed: "at confirmation of any plan, if it should appear that shareholders may benefit, the court in its confirming order can provide for recapture of the default interest ... if the *Ruskin* ruling is determined to be persuasive and to be followed in this Circuit." *Id.*

The court in *Skyler Ridge* declined to follow Judge Yacos' reasoning. Noting that an analysis of the default rate of interest provision as a kind of liquidated damages was implicit in the *Sheppley* reasoning, the court stated:

> The Court finds unpersuasive the analysis of the default interest provision before the Court as a type of liquidated damages. The increased interest rate was negotiated by the parties, and falls well within the range of interest rates that the Court has seen frequently in recent years. An interest rate falling outside this range, on the other hand, may be a liquidated damages provision that must meet the standards for valid liquidated damages. *Cf. Tastyeast,* 126 F.2d at 881–82.

80 B.R. at 511. The *Skyler* court added:

> Unlike the provision for fees, costs and charges in section 506(b), this section provides no federal law authorization to modify the contract rate of interest, whether the estate is solvent or insolvent.... Any restriction on the contract rate of interest must thus come from state law, and not from bankruptcy law....

*Id.* The court then distinguished the *Vanston* holding on the grounds that it involved interest payments that were postponed pursuant to court order and concluded that "[n]either bankruptcy law nor nonbankruptcy federal or state law requires or permits the court to set aside the agreement on interest that the parties have made." *Id.* As a caveat, the *Skyler* court noted that the debtor had not attacked the default interest rate on the grounds of unconscionability or usury. Accordingly, the court did not reach those issues.

The court in *In re Berry Estates, Inc.*, 34 B.R. 612 (Bankr.S.D.N.Y.1983) made a point similar to the one adopted by the California bankruptcy court in *Skyler*. In the words of the New York court:

> Although the debtor argues that a higher post-maturity interest rate is a penalty, it could have avoided paying a higher rate by satisfying the mortgage at maturity. The higher rate merely reflects the fact that a mortgagor who is unable to pay a mortgage at maturity is a greater risk then [sic] a mortgagor not in default. Hence, a less credit worthy entity must pay a premium to obtain the continued use of money.

34 B.R. at 615–16. The court notes that in the *Berry* case, the debtor objected to a post-maturity rate of interest pursuant to an extension agreement calling for interest payable from the date of default " 'at the maximum legal rate of interest *then permitted* for mortgage loans or the interest rate as set forth in the obligation or this extension agreement, *whichever is higher.* (emphasis added)." ' 34 B.R. at 614. Following the execution of the extension agreement, the New York legislature removed any maximum rate of interest on loans in excess of $2.5 million and eliminated the criminal usery penalty for loans carrying an interest rate in excess of 25%. Additionally, mortgage rates substantially increased. The Court recognized that the parties had no way of knowing "the sky would be the limit, subject to the doctrine of unconscionability" for interest rates. *Id.* Despite the Debtor's arguments that a higher post-maturity interest rate was a penalty, the court exercised its discretion

and awarded the secured party post-maturity interest at the rate of two percent over prime, a rate consistent with rates of interest chargeable to corporate debtors at the time the extension agreement matured. *Id.* at 616.

With respect to its assertion that there is no basis for denying the default rate of interest on equitable grounds, Wedgestone relies, at least in part, on the the the fact that the Debtors' estate is solvent. In Wedgestone's view the *Vanston* and *Sheppley* decisions, therefore, are inapplicable. Citing *Ruskin v. Griffiths*, 269 F.2d at 831–32, and *In re International Hydro–Electric System*, 101 F.Supp. at 224, it argues that it would be improper for the court to exercise its equitable powers to deny or reduce the default rate of interest since to do so would only benefit the Debtors not the creditors. Wedgestone highlights the statement of the court in *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company*, 791 F.2d 524, 527 (7th Cir.1986): "It is not the objective of the bankruptcy laws to confer windfalls on debtors."

Wedgestone also criticizes two additional cases in which bankruptcy courts allowed interest only to the extent of the higher of the non-default or market rates of interest. *See In the Matter of Arlington Village Partners, Ltd.* 66 B.R. 308 (Bankr.S.D.Ohio 1986) and *In re 360 Inns, Ltd.*, 76 B.R. 573 (Bankr.N.D.Tex.1987). The *Arlington* case is not helpful to the Court at all because the issue in dispute was the amount of interest to be calculated as damages under 11 U.S.C. § 1124(2)(C), not § 506(b). Moreover, this Court is not impressed with the reasoning in the *360 Inns* case. The judge in the *360 Inns* case based his opinion on the *Arlington* case, the inevitable insolvency of the debtor had it not filed bankruptcy—the debtor was currently solvent—and a conclusory consideration of "the equitable principles of distribution in bankruptcy." 76 B.R. at 585.

Wedgestone, in the alternative, suggests that if the default rate is not allowable in full, it should be reduced only to the extent necessary to pay unsecured creditors in full

or at the very least it should be enforced at least to the extent of five percent above the contract rate and in no event below 20%. Wedgestone derives the five percent figure from a provision for a five percent increase appearing in loan documents of Bank Five for Savings. It derives the 20% figure from the state legislature, noting that that figure has been approved as an acceptable rate of interest in all circumstances. *See* Mass.Gen.Laws ch. 271, § 49.

## IV. CONCLUSION

From the cases cited by the parties and reviewed by the Court, it is clear that there is an absence of uniformity in the treatment of default interest provisions. Courts differ over the characterization of such charges and the legal consequences attending to their imposition. *See generally* Annot., "Validity and Construction of Provision Imposing 'Late Charge' of Similar Exaction for Delay in Making Periodic Payments on Note, Mortgage, or Instalment Sale Contract," 63 A.L.R.3d 50, 56–57 (1975 & Supp.1988). Some courts view the provisions as attempts to provide for liquidated damages and evaluate them according to the law governing liquidated damages. More commonly, courts view the provisions as stipulations for the payment of interest, or additional interest, upon the principal obligation, and evaluate them in light of the applicable state statutes governing usury. *Id.* Moreover, a few courts appear to consider both aspects. With respect to the law governing liquidated damages, courts consider whether the contractual provision is a reasonable estimate of the damages caused by the breach or default and whether the damages the parties might reasonably anticipate are difficult to ascertain. *See A–Z Servicenter, Inc. v. Segall,* 334 Mass. 672, 675, 138 N.E.2d 266 (1956).

Because of Wedgestone's filing with the attorney general, the Debtors cannot rely

upon the Massachusetts usury statute, the purpose of which is to protect necessitous debtors from outrageous demands by lenders. *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167 (1980). The Court considers Wedgestone's claim for default interest to be outrageous—the 48% interest rate exceeds *by far* any of the rates mentioned in the cases cited or reviewed by the Court. However, the Whites can hardly be described as necessitous debtors. Debtors who directly or indirectly own and operate three restaurants and own real estate in one of Boston's most prosperous suburbs and whose bankruptcy estate is solvent simply cannot be squeezed into that category despite their counsel's best efforts. Accordingly, since the Debtors cannot rely on the usury statute, they must convince the Court that the default interest provision is an unconscionable penalty unenforceable under state law. This is because the Supreme Court has determined that a bankruptcy court is not empowered to give a creditor rights that state law withholds. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

What the Court has before it is a mundane story of greed—greed on the part of White and greed on the part of Wedgestone. Wedgestone is in the business of making supposedly "high risk" loans. At the time of the closing, it unarguably was in a superior bargaining position and apparently was able to virtually dictate terms to White, despite White's representation by counsel at the closing. Despite his displeasure with some of the terms required by Wedgestone, White chose to go forward with the transaction obviously anticipating a lucrative business situation and minimizing the risks inherent in the operation of a seasonal business with high debt service obligations. No gun was pointed at his head; no one was twisting his arm.[2] Presumably, all White stood to lose by not going forward with the loan, the terms of

---

**2.** As the court in *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987), stated:

A contractual provision that specifies a change in interest rate on default illustrates a broader principle, that contracting parties have the power to contract for interest rates that vary based on a variety of factors.... A

default interest rate, like other interest rates in a contract, should be the subject of negotiation at the time the contract is negotiated. The inclusion of a default interest rate indicates that the parties have given their assent to this provision.

*Id.* at 511.

which he must be presumed to have read and understood, was the opportunity to buy "Pufferbellies" in Hyannis. He did not stand to lose his other properties as is now the case.[3]

Even overlooking the dispute over the amount of principal prepayments to Wedgestone, White's ability to make his monthly interest payments did not last long. Foreclosure proceedings were the inevitable result. This bankruptcy proceeding was filed to avert a foreclosure sale.

During the course of the bankruptcy proceeding, Wedgestone has not engaged in any obstructive tactics. Indeed, its counsel has been remarkably patient in the 15 months since the filing while the Debtors have made and broken promises and essentially stalled for time. Additionally, the Debtors have not proposed a plan of reorganization at this time. White is now asking the Court to undo his improvidence in entering into the loan transaction, to defeat Wedgestone's expectations whether reasonable or not, and to pave his exit from bankruptcy with a windfall. Wedgestone, on the other hand, seeks hundreds of thousands of dollars in interest at a rate that shocks at least this Court's conscience. Moreover, to paraphrase Judge Yacos in *In re W.S. Sheppley & Co.*, 62 B.R. 271, 279 (Bankr.N.D.Iowa 1986), Wedgestone never faced any realistic risk of nonpayment of its debt either before or after the filing and there was no evidence that the contract rate of interest i.e., 16.5% per annum, was not equal to the prevailing market rate of interest at the time of default and thereafter. Indeed, just the opposite is the case. To repeat greed permeates this case.

▮ Cases such as *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir.1959), and *In re International Hydro–Electric System*, 101 F.Supp. 222 (D.Mass.1951), stand for the proposition that a variable interest rate upon default is allowable when the debtor is solvent. *See also Debentureholders Protective Committee of Continental Investment Corp. v. Continental Investment Corp.*, 679 F.2d 264 (1st Cir.), *cert.*

*denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). The Court is convinced that if the default rate of interest sought by Wedgestone were reasonable a state court and this Court would have no trouble enforcing it. However, the Court finds that the default rate at issue here is nothing more than a device (akin to a sledgehammer) to coerce the Debtors into prompt payment. Despite the fact that bankruptcy law does not unequivocally forbid the allowance of penalties, *see* 11 U.S.C. § 726(a), this Court cannot sanction the allowance of default interest at the rate of 48% per annum.

Mindful of the axiom that hard cases make bad law, the Court, in view of the cases discussed, the equities involved (or perhaps more appropriately the lack of them) and also the solvency of the Debtors' estate, finds that the default interest provision is unenforceable as a penalty. The Court simply is unable to conclude that the default interest provision at issue here represents anything close to a reasonable estimate of Wedgestone's actual damages. On the contrary, as the Court has indicated, the provision simply is "unreasonably and grossly disproportionate to the real damages from ... [the] ... breach." *See A–Z Servicenter, Inc.*, 334 Mass. at 675, 138 N.E.2d 266.

The Court recognizes that it is customary to disallow the penalty interest provision in its entirety. In view of the compelling rationale of the *Ruskin* line of cases and the solvency of the Debtors' estate, the Court would, if possible, reform the note to provide for a reasonable rate of interest upon default as Wedgestone suggests the Court do in the alternative. However, the Court is unable to conclude that reforming the note in the manner proposed by Wedgestone would be tenable in law or equity.

An action to reform a contract is an equitable action. Reformation is permitted only when a written instrument, through fraud or mistake, does not represent the true intention of the parties. Relief is inappropriate, however, where its purpose is

**3.** The Court notes that on April 14, 1988 the Creditors' Committee, on behalf of the Debtors, filed a notice of intent to sell the commercial property on Needham Street in Newton, Massa-chusetts. On June 8, 1988, the Court entered an order confirming the sale of the real estate for $4.5 million.

simply to relieve against an oppressive bargain or create a better one. *See generally E. Clemens Horst Co. v. Federal Mutual Liability Insurance Co.*, 33 F.Supp. 598 (D.Mass.1940). Thus, the Court is unable to find that the June 26, 1986 note did not represent the true intention of the parties. Accordingly, the Court will not allow the application of the default rate of interest, or any lesser reasonable default rate.

The Court's decision obviates the need to consider the Debtors' argument that they intend to file a Chapter 11 plan that will cure all defaults under the note pursuant to 11 U.S.C. § 1124 (West 1988), even assuming the applicability of that section which is doubtful given the fact that the note matured prepetition.

In view of the foregoing, the memorandum and arguments of counsel, the Court hereby allows Wedgestone its claim for principal, interest at the contract rate, late charges, insurance premiums, and appraisal fees. Wedgestone is hereby ordered to file an application for attorneys' fees no later than three weeks from the date of this memorandum. A hearing on the reasonableness of the attorneys' fees is scheduled for August 4, 1988 at 1:00 P.M. At that time, the Court will issue a final order. So ordered.